UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
NOV 12 2024
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

---

**CURT A. POLITO**,

               Plaintiff,

       v.

**UNIVERSITY OF ROCHESTER, CHERYL
M. KODJO, FLAVIA NOBAY, ROBERT J.
SWANTZ, ROBERT S. FREEMAN,
DEBRA M. OGIE, ADRIENNE MORGAN,
DAVID R. LAMBERT, and NATIONAL
BOARD OF MEDICAL EXAMINERS**,

           Defendants.

---

Civil Action No.: 24 CV 6655

## COMPLAINT

## JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, CURT A. POLITO, hereby files this Complaint against Defendants,

UNIVERSITY OF ROCHESTER ("UR"), CHERYL M. KODJO, FLAVIA NOBAY, ROBERT J.

SWANTZ, ROBERT S. FREEMAN, DEBRA M. OGIE, ADRIENNE MORGAN, DAVID R.

LAMBERT, and NATIONAL BOARD OF MEDICAL EXAMINERS ("NBME"), and

respectfully alleges as follows:

## NATURE OF THE ACTION

1.     This action is brought by Plaintiff to redress violations of the Americans with

Disabilities Act ("ADA") of 1990, 42 U.S.C. §§ 12101-12213, the Rehabilitation Act of 1973

("RA"), 29 U.S.C. §§ 701-797, the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law §§ 290-301, breach of contract, tortious interference with contract, promissory

estoppel, and unjust enrichment.

2.    Defendants Cheryl M. Kodjo, Flavia Nobay, Robert J. Swantz, Robert S. Freeman, Debra M. Ogie, Adrienne Morgan, and David R. Lambert are sued in their individual capacities as set forth below.

## JURISDICTION AND VENUE

3.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question).

4.    This Court can exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims Plaintiff brings under the laws of the State of New York because they arise from the same case or controversy giving rise to the federal claims.

5.    This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

6.    This Court can exercise personal jurisdiction over Defendant NBME because it does substantial business in New York, which includes selling medical education related exams and administering United States Medical Licensing Examination ("USMLE") tests and accommodations, the conduct of which gives rise to the claims asserted herein.

7.    This Court can exercise personal jurisdiction over all other defendants, because, upon information and belief, they reside in this District.  They all work and own real property in Monroe County.

8.    Venue is proper in the Western District of New York pursuant to 28 U.S.C. 1391. A substantial part of the acts or omissions by all defendants giving rise to the claims in this Complaint occurred within this District and all parties, excluding Defendant NBME, reside in this District.

## PARTIES

9.      Plaintiff Curt A. Polito is a resident and domiciliary of the State of New York. Plaintiff, at all relevant times herein, was a student at UR and/or patient of UHS.

10.     Upon information and belief, based on other court filings, Defendant UR is an educational corporation organized and existing under the laws of the State of New York, having a principal place of business at 263 Wallis Hall, Rochester, New York 14627. Defendant UR operates the University of Rochester School of Medicine & Dentistry ("URSMD") and University Health Service ("UHS").

11.     Defendant Cheryl M. Kodjo, MD, is a UHS physician provider (Vice Provost and UHS Director effective July 1, 2024) at UR, faculty member, Advisory Dean ("AD"), and "Medical Student Promotions and Review Board ("MSPRB") member at URSMD. Upon information and belief, Dr. Kodjo is domiciled in Monroe County, residing at 190 Oak Ln, Rochester, New York 14610, with UHS business location of 738 Library Rd #1, Rochester, New York 14627, and with URSMD business location of 601 Elmwood Avenue, Rochester, New York 14642.

12.     Defendant Flavia Nobay, MD, is a faculty member, Associate Dean for Student Affairs ("ADSA"), Disability Access Coordinator for medical students with disabilities, and MSPRB member at URSMD. Upon information and belief, Dr. Nobay is domiciled in Monroe County, residing at 19 Tamarron Way, Pittsford, New York 14534 and with URSMD business location of 601 Elmwood Avenue, Rochester, New York 14642.

13.     The MSPRB exercises management and supervisory authority at URSMD, including for matters regarding individual student promotion and retention, including mandatory leaves of absences, withdrawal, and dismissals. The ADSA is the spokesperson for the MSPRB.

14.    At all relevant times, Defendant Robert J. Swantz, MD, was a faculty member and Chair of the MSPRB at URSMD.  Upon information and belief, Dr. Swantz is domiciled in Monroe County, residing at 39 River Birch Ln, Webster, New York 14580 and with URSMD business location of 601 Elmwood Avenue, Rochester, New York 14642.

15.    At all relevant times, Defendant Robert S. Freeman, PhD, was a faculty member and Co-Chair of the MSPRB at URSMD.  Upon information and belief, Dr. Freeman is domiciled in Monroe County, residing at 49 St Andrews Blvd, Fairport, New York 14450 and with URSMD business location of 601 Elmwood Avenue, Rochester, New York 14642.

16.    At all relevant times, Defendant Debra M. Ogie, MD, was a faculty member and member of the MSPRB at URSMD.  Upon information and belief, Dr. Ogie is domiciled in Monroe County, residing at 1924 Clark Rd, Rochester, New York 14625 and with URSMD business location of 601 Elmwood Avenue, Rochester, New York 14642.

17.    At all relevant times, Defendant Adrienne Morgan, PhD, was a faculty member and member of the MSPRB at URSMD, and Vice President/Director of the Office of Equity and Inclusion ("OEI") at UR.  Upon information and belief, Dr. Morgan is domiciled in Monroe County, residing at 211 Rocket St, Rochester, New York 14609 and with UR/URSMD business location of 601 Elmwood Avenue, Rochester, New York 14642.

18.    Defendant David R. Lambert, MD, is a faculty member and Senior Associate Dean for Medical Student Education and MSPRB member at URSMD.  Dr. Lambert is self-described as the "principal" of the medical school.  Upon information and belief, Dr. Lambert is domiciled in Monroe County, residing at 3811 Clover St, Henrietta, New York 14467 and with URSMD business location of 601 Elmwood Avenue, Rochester, New York 14642.

- 4 -

19.    Upon information and belief, based on other court filings, Defendant NBME is a non-profit corporation, organized and existing under the laws of the District of Columbia, with its principal place of business located at 3750 Market Street, Philadelphia, Pennsylvania 19104. Defendant NBME does substantial business in New York which includes selling medical education related exams and administering United States Medical Licensing Examination ("USMLE") tests and accommodations.

## FACTUAL BACKGROUND

### I.    Mr. Polito's Relationship with UR

20.    Mr. Polito successfully completed a post-baccalaureate premedical program at Johns Hopkins University ("JHU") between 2019 and 2020.  While at JHU, Mr. Polito became more familiar with linkage agreements.  Linkage agreements are formal agreements between the post-baccalaureate premedical program and the medical school which allow qualified applicants to accelerate the application process.

21.    JHU had linkage agreements with several medical schools, including URSMD. Mr. Polito researched and visited multiple medical schools on this list.  Mr. Polito visited URSMD for an official preadmissions tour around October 16, 2019.  Before submitting his application for admission, UR conveyed to Mr. Polito that its medical school was distinct from other medical schools because of its unique combining of medical science with the humanities. Along with its trademark biopsychosocial model fostering a more relationship-centered approach to healthcare, URSMD placed a special emphasis on its inclusive environment and on supporting students underrepresented in medicine (e.g. students with disabilities).   Its admissions website emphasized values of respect, integrity, and diversity as a "difference-maker." URSMD

- 5 -

described itself as a supportive, "affirming environment" where students could "achieve their highest objectives, unhindered by constraints on access."

22.     For these reasons, and as a person with a disability, Mr. Polito chose to apply to URSMD through its linkage agreement with JHU, to the exclusion of all other medical schools. Under this agreement, and in exchange for this accelerated application process, Mr. Polito was not permitted to apply to any other medical schools.

23.     Mr. Polito submitted his application for admission around January 10, 2020.

24.     Mr. Polito was required to complete all phases of the application process while simultaneously completing the rigorous premedical program at JHU which condenses the average four years of basic sciences medical school admissions course prerequisites into one. There were no guarantees that he would be admitted, and any admission notice was conditional upon successfully completing the post-baccalaureate premedical program and meeting specified individual course grade and overall GPA targets.

25.     Following an in-person interview, Mr. Polito received an offer of admission around March 2020 and later accepted this offer.

26.     Before matriculating and before the start of each subsequent year, Mr. Polito was required, among other requirements, to sign and attest to reading and agreeing to the policies set forth in the URSMD Student Handbook ("Student Handbook").  A student's failure to sign and agree to the Student Handbook would subject the student to an "administrative suspension" and would prohibit the student from participating in all academic programs, subject the student to a $100.00 administrative fee and an "administrative hold" on the release of all financial aid, and potentially subject the student to further discipline (e.g. referral to the Honor Board or dismissal).

27.    The Student Handbook includes specific contractual obligations of faculty pertaining to the mistreatment, discrimination, and harassment of students.  All URSMD faculty are contractually bound to these terms and must make attestations that they have read and understood these terms.

28.    Included among these terms in the Student Handbook are clear unambiguous policies, specific to medical students that failures in, or violations of, any of the following by faculty or the medical process itself are considered to be harassment or discrimination:

    a.    "Obligation to…demonstrate respect for all medical students…without regard to…disability";

    b.    "[I]nappropriate behavior that negatively impacts [URSMD's] learning environment is prohibited…[I]nappropriate behavior includes but is not limited to…any discrimination or harassment based on…disability…and/or the use of grading and other forms of assessment in a punitive manner;"

    c.    "The intentional or unintentional occurrence of such behavior results in a disruption of the spirit of learning and a breach in the integrity and trust among, and between, learners, faculty, and staff;"

    d.    The design of all curricula, courses, learning activities, and academic support services "must ensure equal access for learners with diverse backgrounds and abilities"; and

    e.    Assessments must ensure "valid and equitable measurement of learning".

29.    In addition to receiving a copy of the Student Handbook, Mr. Polito received a copy of another document which further introduced and explained the role of URSMD's ADA Ombudsperson for Medical Students with Disabilities ("Medical Students ADA

- 7 -

Ombudsperson"), Dr. Susan Hetherington, PhD, as identified and outlined in the Student

Handbook.  *See* **Exhibit 1** (A Word From Your ADA Ombuds[person]).

30.     Mr. Polito paid the application fee, as well as any tuition and related fees for that

year and each subsequent academic year. For the 2020-2021 academic year, the estimated cost of

attendance was $83,798.00.

31.     Mr. Polito formally matriculated into URSMD in August 2020.

32.     As a medical student, Mr. Polito served as a volunteer at St. Joseph's

Neighborhood Center, a Rochester, New York non-profit organization dedicated to providing

healthcare services to uninsured and underinsured individuals and families in the greater

Rochester area.

33.     Mr. Polito held multiple leadership positions at URSMD, including Class Council

Honor Board Representative, President of the URSMD Chapter of the American Medical

Association Medical Student Section ("AMA-MSS"), AMA-MSS Region 7 Membership Chair,

President of the URSMD Chapter of the Medical Society of the State of New York Medical

Student Section, and Medical Student Liaison to the Monroe County Medical Society.

34.     In 2021, Mr. Polito was awarded a National Health Service Corps ("NHSC")

Scholarship by the United States Department of Health and Human Services ("HHS").  NHSC

scholarships are awarded to students who are committed to a primary care specialty focused on

serving underserved populations in designated Health Professional Shortage Areas ("HSPA's").

Through contractual agreement, Mr. Polito was obligated to serve one year at an NHSC-

approved HSPA site for each year of tuition and support received, with a two-year minimum

service requirement.

- 8 -

35.     During the time immediately preceding the discriminatory events prompting this Complaint, Mr. Polito was finishing phase 2 of the four-phase curriculum.

36.     Phase 2 included a required Primary Care Clerkship ("PCC") and a shelf exam purchased from the NBME.  Mr. Polito received disability accommodations (as discussed below) for this exam.  For this course, Mr. Polito received the highest grade possible, "honors"—reserved for the top 33% of the class.

37.     An experienced physician preceptor completed Mr. Polito's final evaluation for the clerkship.  In all categories covering knowledge base, clinical reasoning, and professional qualities, Mr. Polito received either "outstanding" or "exceptional" notations.  The preceptor wrote:

> [Mr. Polito] is an exceptional student...Many of my patients have commented on [Mr. Polito's] bedside manner and communication skills.  He treated all patients and staff with respect...he also excelled in caring for patients with intellectual challenges. [Mr. Polito] is a mature student with a successful background and it shows. He has been a pleasure to work with and will make an excellent physician.

## II.    Mr. Polito's Documented Disability

38.     Mr. Polito has a documented disability, attention deficit hyperactivity disorder ("ADHD"), and is therefore a member of a protected class.  Mr. Polito has struggled with societal barriers resulting from his disability for his entire life.  He received accommodations for his disability in college, graduate school, and in the workplace—including his post-baccalaureate premedical program at JHU.

39.     Following his August 2020 matriculation into URSMD's MD program, Mr. Polito requested accommodations for his disability directly with the (then) ADSA and Disability Access Coordinator, Dr. Kathryn Castle, PhD.  In confidential memo, she determined that Mr. Polito was

a qualified individual with a disability as defined by the ADA and Section 504 of the RA and that

he was to receive the following accommodations:

      a.  "Extended time on examinations and quizzes (100% additional time)";

      b.  "Breaks during exams: 10 minutes per each exam hour"; and

      c.  "A separate testing environment with minimal distractions (no other students in the testing room)".

40.     Mr. Polito was further permitted to use a physical writing instrument and notepaper for exams without need to request accommodation as this was provided to all students.

**III.    Mr. Polito's Step 1 Request for Accommodations**

41.     As part of URSMD's MD program requirements, medical students must take and pass the USMLE Step 1 exam to progress to phase 3 of the four-phase program. Not all medical schools have this requirement. Upon learning that URSMD was not extending its own approved accommodations for this program required exam, Mr. Polito was required to obtain the accommodations himself. Around February 2, 2022, Mr. Polito therefore submitted a request to the NBME seeking to obtain the same URSMD approved accommodations for the Step 1 exam.

42.     On March 30, 2022, the NBME notified Mr. Polito that his requests for testing accommodations were largely denied. Mr. Polito requested 100% additional test time, additional breaks (10 minutes per each exam hour), a distraction-reduced environment (no other students in the testing room), and use of a physical writing instrument and notepaper. The NBME only granted 50% additional test time and a separate testing room "for administrative purposes."

43.     Without ever meeting with Mr. Polito, the NBME denied Mr. Polito's requests for 100% additional testing time, additional breaks (10 minutes per each exam hour), and use of a

physical writing instrument and notepaper.   The NBME denial followed extensive medical documentation, including:

    a.   Comprehensive evaluations from psychologists;

    b.   A letter from a psychiatrist expert on ADHD, who had treated Mr. Polito for multiple years, confirming Mr. Polito's medical diagnosis, functional limitations and appropriate rationale for the accommodations requested;

    c.   A history of receiving the same accommodations requested; and

    d.   A recent January 25, 2022 letter from Mr. Polito's treating physician (Dr. Behrman) at UHS confirming Mr. Polito's medical diagnosis and certifying the need for the accommodations requested after reviewing all medical documentation and meeting with Mr. Polito.

44.    In granting partial (but unreasonable) accommodations, the NBME was (at minimum) regarding Mr. Polito as having an impairment meeting the definition of disability under the ADA and RA.

45.    The NBME's accommodations request form only allowed Mr. Polito to request accommodations for the exam he had paid the applications fee for and was currently registered for.

46.    The NBME's accommodations request form regarding Step 1 only allowed one box (total) to be checked under the following listed options ("**Check <u>ONLY ONE</u>** box")(emphasis original): "Additional break time **over 1 day**"; "Additional break time **over 2 days**"; "25% Additional test time (Time and ¼) **over 2 days**"; "50% Additional test time (Time and ½) **over 2 days**"; "100% Additional test time (Double time) **over 2 days**"; or "Additional break time and 50% additional test time (Time and 1/2 ) **over 2 days**" (emphasis original).  In

other words, these were the only requests allowed regarding break time and additional testing time.

47.    The NBME did not provide a box for "other" or requesting additional break time and 100% additional test time in this specific section so Mr. Polito included this request through referenced attachment. Though medically necessary given the length of the exam, Mr. Polito was deterred from requesting the exam to be provided over a period more than 2 days.

48.    In April 2022, shortly after receiving the NBME's denial of his full request for accommodations, Mr. Polito spoke to his AD, Dr. Cheryl Kodjo, and requested a schedule adjustment and "pause" in his academic schedule so that he could seek medical and legal advice to address the NBME's denial of accommodations. Dr. Kodjo flatly refused his request for a schedule adjustment to address issues with the NBME and notified Mr. Polito that any leave would require him to take an entire academic year off.  She further stated Mr. Polito would be disqualified from taking the Step 1 exam during such a leave of absence.  As discussed below, the policy implication was that he would also be disqualified from submitting requests for accommodations to the NBME.  Later in the conservation, however, Dr. Kodjo stated students are only allowed to request schedule adjustment of around 2-3 weeks for additional study time, at most, using elective time, and that she would discuss this possibility with Dr. Nobay, who was now the ADSA and Disability Access Coordinator.  Dr. Kodjo advised Mr. Polito she would get back to him with additional information quickly.

49.    Mr. Polito did not hear from Dr. Kodjo until May 9, 2022, when she stated that this request to delay taking the Step 1 exam 2-3 weeks would need to be submitted to Dr. Nobay and reviewed by the MSPRB.  Dr. Kodjo told Mr. Polito that he was required to submit the

- 12 -

request the very next day. Mr. Polito rushed to prepare this request, as this was the only request he was allowed to make, which he timely submitted on May 10, 2022.

50.     On May 16, 2022, the MSPRB responded to Mr. Polito's request by letter, granting an approximate 2-week delay, and advised him he was required to sit for the Step 1 exam by June 20, 2022, or face a mandatory leave of absence and a penalty notation on his permanent academic record.

51.     On June 16th and 17th, in the absence of appropriate testing accommodations or support from URSMD, and under threat of academic penalty, Mr. Polito sat for the Step 1 exam at an NBME selected testing site in Rochester, NY. On Day 1 of the exam, it became immediately apparent that the NBME had not implemented the accommodation of a distraction reduced testing environment, as he was placed near the entrance of the testing facility where there were numerous distractions caused by a large window. On the morning of June 17th, Mr. Polito submitted a letter of protest to the NBME and, without other options, he sat for Day 2 of the exam under the same conditions.

52.     On July 27, 2022, Mr. Polito was notified of his exam result of F (fail). Along with this score, the NBME sent Mr. Polito a letter in which it conceded there were issues with his testing site.

53.     Mr. Polito immediately contacted Dr. Kodjo the following day and made her aware of the issues with his testing accommodations and his resulting failing score. He requested a meeting to discuss how URSMD could adjust his schedule to allow him time to address these issues. What followed was a series of circular, ineffective and, ultimately, retaliatory responses by UR and its administration.

- 13 -

**IV.    UR Summarily Denies Mr. Polito's Request for Accommodations**

54.    On August 16, 2022, Mr. Polito met with Dr. Nobay and Dr. Kodjo and requested the following accommodations:

a.    That URSMD, as an institution that requires a passing Step 1 exam score as part of its program, assist him in securing its already approved accommodations for this exam; and

b.    That URSMD pause his academic clock so he could pursue legal and medical assistance to obtain necessary accommodations to sit for the Step 1 exam.

55.    Mr. Polito also requested a formal discussion related to accommodations for URSMD's clinical clerkship program, which he would be required to complete after taking and passing the Step 1 exam.

56.    In response to the above-listed requests, and with no review or deliberation, Dr. Nobay and Dr. Kodjo stated that neither of Mr. Polito's accommodation requests would be granted.  They told him that the NBME's failure to grant testing accommodations was not URSMD's concern, and that if he did not take and pass the exam within one year, regardless of whether he had accommodations or not, he would be placed on a mandatory leave of absence and considered for dismissal.  They further advised him that no other measures would stop the one-year clock from running.

57.    Dr. Nobay and Dr. Kodjo were referring to a URSMD policy stating that students had "12 months from the time of initially taking Step 1 or a total of three attempts whichever occurs first to pass" or face a "dismissal recommendation".

58.    Mr. Polito further requested that URSMD remove his June 2022 exam score as an "attempt" on his academic record, because the NBME failed to provide even its partially

approved accommodations. Dr. Nobay denied the request and stated that the failed score would be recorded on Mr. Polito's permanent academic record. As of this date, the exam attempt is still part of Mr. Polito's academic record in URSMD's Medical Student Information System ("MedSIS").

59.    UR's Policy Against Discrimination and Harassment ("PADH"), requires that all management and supervisory personnel (which includes all faculty and Diversity & Inclusion Officers, among others) promptly report (within 48 hours) all discrimination and harassment concerns to the Office of Equity and Inclusion ("OEI").

60.    The PADH provides a non-exhaustive list of behaviors which constitute discrimination, harassment, and retaliation. For example, "bullying", "derogatory statements", and "stereotyping activities" about a person with a disability would constitute harassment.

61.    A mandatory reporter's failure to report upon observing, learning of, or receiving a report of such conduct constitutes a violation of UR policy and is subject to discipline.

62.    Upon information and belief, Dr. Kodjo and Dr. Nobay failed to promptly report these concerns as required by UR policy. No one from UR reached out to Mr. Polito regarding his concerns. URSMD failed to promptly investigate these concerns in accordance with UR policy.

63.    In summarily denying Mr. Polito's requests, URSMD also failed to provide Mr. Polito with any documentation that his requests were unreasonable, specifically that his requests would have fundamentally lowered the published technical standards of the medical school or placed an undue burden on the medical school.

64.    Not only was Mr. Polito being subjected to inferior terms and conditions, he was also being treated less favorably than other students because of his disability. Other students are

routinely granted pauses (upwards of four years or more) in their MD program to pursue research or other programs. Moreover, students directly or indirectly affected by international events have been granted accommodations and schedule adjustments with no repercussions (i.e. no academic penalty).

65.    Upon information and belief, following a conversation Mr. Polito had with another medical student, Mr. Polito found that UR permitted the student with a medical, family, or personal issue a pause in her medical school curriculum with no academic penalty and was even given a temporary research position at UR in the interim.

**V.    Mr. Polito Continues to Seek Accommodation**

66.    Following the August 2022 meeting, Mr. Polito attempted numerous times to seek reconsideration of his accommodation requests. On September 29, 2022, he emailed Dr. Nobay again, reiterating his discrimination concerns. He then attempted to schedule a meeting with Dr. Nobay, but Dr. Nobay ignored his September 30, 2022 email where he provided dates and times available to meet.

67.    On October 27, 2022, *nearly four weeks* after not receiving a reply, Mr. Polito emailed Dr. Nobay again, reiterating his discrimination concerns.

68.    Upon information and belief, Dr. Nobay failed to promptly report (within 48 hours) these concerns as required by UR policy. Dr. Nobay had ignored Mr. Polito's email and no one from UR reached out to Mr. Polito regarding his concerns. As a result, URSMD failed to promptly investigate these concerns in accordance with UR policy.

69.    Following Mr. Polito's additional follow-up emailed requests, on October 27, 2022, Dr. Nobay finally replied and set up a meeting now with a representative from the UR Office of Disability Resources.

70.     On November 1, 2022, Mr. Polito met with Dr. Nobay and Jen Prosceo, UR's campuswide Director of Disability Resources.  Mr. Polito explained, yet again, that he needed assistance from URSMD and a "pause" to his academic clock so that he could seek medical and legal support to obtain necessary accommodations from the NBME.  Dr. Nobay and Director Prosceo summarily denied his requests, without providing a specific reason for the denial.

71.     During this meeting, Mr. Polito also attempted to raise concerns regarding his upcoming clinical rotations.  He specifically requested academic and educational course materials be delivered to him in printed mediums (versus digital mediums), which is a reasonable accommodation often made for persons with ADHD.  Mr. Polito had noted the barriers he faced using digital mediums (including attention and cognitive fatigue) and that printed mediums were helpful in alleviating these barriers.  Dr. Nobay and Director Prosceo were unreceptive, dismissive, and unnecessarily scrutinized that request.  That same afternoon, Director Prosceo, sent Mr. Polito an email which stated that there was no "supporting evidence that there is a disability-related barrier that [printed mediums] would remove."

72.     The Director's statement was insensitive and demonstrably false.  Scientific research and experts endorse printed mediums as a supportive means to remove ADHD-related barriers.  Regardless, requesting printed mediums as an accommodation would not even be necessary if UR and URSMD utilized universal design, a practice which the UR Office of Disability Resources endorses on its website.

VI.     **Mr. Polito Seeks to Overcome Repeated Refusals to Accommodate**

73.     At or around December 2022, after URSMD continued its refusal to reasonably accommodate Mr. Polito's disability, Mr. Polito reached out to his physician to discuss medication modifications in effort to compensate for his lack of accommodations.

- 17 -

74.    Upon medical advice, Mr. Polito sought to shift from an exclusively short acting medication regimen to a long-acting medication and short acting medication combined regimen. Due to medication shortages caused by the COVID-19 pandemic, however, Mr. Polito was unable to secure any long-acting medications until April 2023.

75.    Mr. Polito continued to oppose sitting for the Step 1 exam without URSMD approved accommodations.

76.    Upon information and belief, and because both Dr. Nobay and Dr. Kodjo are members of the MSPRB, and because the MSPRB meets monthly to discuss all students, the MSPRB was aware that URSMD approved accommodations were not being implemented on all "examinations and quizzes" as required in Mr. Polito's approved accommodations letter.

77.    Upon information and belief, the MSPRB was further aware that Mr. Polito's requests for schedule adjustments were being repeatedly denied.

78.    Upon information and belief, the MSPRB failed to promptly report (within 48 hours) these concerns as required by UR policy.  No one from UR reached out to Mr. Polito regarding his concerns.  As a result, URSMD failed to promptly investigate these concerns in accordance with UR policy.

79.    URSMD took adverse action against Mr. Polito because of his opposition to sitting for a required exam without his URSMD approved accommodations.  On March 10, 2023, Mr. Polito received a letter from the MSPRB, stating that he was required to appear before them at their April 4, 2023 meeting to discuss academic performance issues, and, if he did not, he would face suspension.  Mr. Polito was not permitted to bring his cell phone or any other electronic devices into the meeting or record the meeting.

**VII.    Behind Closed Doors, UR Administration Demeans Mr. Polito with Disparaging Statements Regarding His Disability.**

80.    At the April 4, 2023 meeting, the MSPRB told Mr. Polito that there were absolutely no exceptions to URSMD's one-year policy.

81.    In response, Mr. Polito attempted to discuss the barriers that he faced due to his disability.  One member of the MSPRB asked him what specialty he planned to enter.  When he responded that he would like enter the practice of either family medicine or internal medicine, Dr. Debra Ogie stated, in a demeaning tone, "well, they see patients every 15 minutes"— implying that he was not capable of treating patients due to his disability and need for accommodations.[1]  No one in the room objected.

82.    On April 6, 2023, Mr. Polito reported Dr. Ogie's conduct to Dr. Kodjo.  Upon information and belief, Dr. Kodjo failed to promptly report (within 48 hours) these concerns as required by UR policy.  Dr. Kodjo later admitted in an email to Mr. Polito that she had not reported the concerns in accordance with UR policy.  As a result, URSMD failed to promptly investigate these concerns in accordance with UR policy.

83.    On April 11, 2023, the MSPRB sent Mr. Polito a letter denying his request for a schedule adjustment and stating that he was required to take and pass the Step 1 exam by June 5, 2023.

---

[1] According to the New England Journal of Medicine, one of the most esteemed peer-reviewed journals in medicine, students with disabilities "regularly confront ableist notions about who is qualified to become a physician."  Suchita Rastogi, *Establishing Equity in Medical Education — Supporting Clinical Trainees with Disabilities*, 384 New Eng. J. Med. 885 (2021).

84.     Again, the MSPRB was aware that URSMD approved accommodations were not being implemented on all "examinations and quizzes" as required in Mr. Polito's approved accommodations letter.

**VIII.   ADA Access Coordinator and Advisory Dean Continue to Reject Mr. Polito's Requests for Accommodation and Threaten Dismissal**

85.     On April 19, 2023, Dr. Kodjo scheduled a meeting with Mr. Polito and Dr. Nobay. Behind closed doors, with threats that recording was not permitted, Dr. Nobay reiterated the April 11, 2023, MSPRB letter citing the "take and pass the USMLE Step 1 exam by June 5th, 2023" portion of the letter.  In addition to his initial request for a schedule adjustment to address issues with the NBME, Mr. Polito expressed an additional need for a schedule adjustment because he was having trouble accessing medication due to national shortages.

86.     Again, Dr. Nobay refused to consider this request, despite the fact that she was Mr. Polito's Disability Access Coordinator.  When Mr. Polito referenced the URSMD Student Handbook which discusses a "temporary academic pause" as a reasonable accommodation, Dr. Nobay responded that temporary academic pauses did not apply to him.

87.     Dr. Nobay then advised Mr. Polito, that despite the MSPRB letter reiterating a take and pass June 5th deadline, that he could request to sit for the exam on June 5th, with an exemption request that the exam score would not be returned for weeks later.  This was the only request he could make.  Mr. Polito was being pressured to sit for an exam without approved accommodations.

88.     Both Dr. Nobay and Dr. Kodjo continued to threaten Mr. Polito with a mandatory leave of absence and/or dismissal if he did not comply.

- 20 -

89.     Mr. Polito was so distraught by these continued closed-door summary denials of his accommodations requests and demeaning conduct towards his disability, that, after this meeting, he stopped his regular physical exercise regime, placing his health and ADHD symptom control at risk.  Up until that time, Mr. Polito was regularly using one of UR's fitness center for workouts.  The morning of April 19 was the last day he entered the UR fitness center.

## IX.     Mr. Polito Reports Concerns to the Senior Associate Dean

90.     Concerned about being dismissed from the medical school due to lack of acccommodations, Mr. Polito scheduled a meeting with the Senior Associate Dean for Medical Education, Dr. David Lambert, on April 25, 2023.  At that meeting, Mr. Polito made Dr. Lambert aware of his concerns about the comments made by Dr. Ogie in the April 4 meeting.  As a member of the MSPRB, Dr. Lambert was also in attendance for this meeting and noted that he also heard Dr. Ogie's comment.  Although Dr. Lambert stated that what Dr. Ogie said was wrong, upon information and belief, Dr. Lambert failed to promptly report (within 48 hours) these concerns as required by UR policy. No one from UR reached out to Mr. Polito regarding his concerns.  As a result, URSMD failed to promptly investigate these concerns.

91.     There was discussion as to whether the MSPRB would be amenable to reconsidering the arbitrary June 5, 2023 "take and pass" deadline to allow him time to adjust his medication in an attempt to overcome the barriers created by URSMD not providing its approved accommodations for "all examinations and quizzes" as required in his accommodations letter and given URSMD's refusal to consider any schedule accommodations and assistance to address issues with the NBME.

92.     Dr. Lambert stated that he had never seen the NBME approve 100% additional time for its exams as an accommodation.

93.    The message Mr. Polito received from Dr. Lambert was that the only request he could make was for time to adjust to medications only, made directly to the MSPRB, and stated that there were no guarantees that the request would be granted.  In other words, Mr. Polito's request was likely to be denied, yet again, even though he was willing to experiment with a different and potentially dangerous medication regimen to navigate the Step 1 exam given the lack of URSMD approved accommodations for this program required exam.

94.    Upon leaving Dr. Lambert's office, Mr. Polito walked past Dr. Nobay's office, whose door was now open and could likely see Mr. Polito departing.

95.    Later that afternoon, Mr. Polito emailed Dr. Nobay noting he was going to prepare a new request and wanted input from his physician.  Dr. Nobay replied stating Mr. Polito needed to discuss any new request he may make with Dr. Kodjo before submitting it and the request would be due the following day at noon (less than 17 hours later).

96.    Upon information and belief, Dr. Nobay was retaliating against Mr. Polito with an arbitrary deadline for meeting with Dr. Lambert.  On April 26, 2023, without any time to seek medical advice regarding the alternative medication, Mr. Polito sent another request to the MSPRB—this time, seeking additional time to try a new medication before taking the Step 1 exam.

**X.    UR Retaliates Against Mr. Polito with Impossible Conditions**

97.    On May 3, 2023, the MSPRB issued a letter to Mr. Polito amending its prior deadline of June 5, 2023 to end of July 2023, with an additional impossible requirement that he schedule the exam by May 15, 2023.  The letter further stated Mr. Polito would be placed on a mandatory leave of absence, and face possible dismissal, if he failed to take the Step 1 exam by July 28, 2023.

98.     The MSPRB did not phrase Mr. Polito's request as a request for a reasonable accommodation—instead, the board stated he had "surpassed the time requirements" and had submitted a "second request" to "delay" taking the exam. The MSPRB further advised that Mr. Polito was to notify Dr. Nobay if there were any delays in registering by the new May 15, 2023 arbitrary deadline.

99.     The deadlines imposed by the MSPRB were impossible to meet, as Mr. Polito was required to submit a new request for accommodations to the NBME and have those accommodations reviewed before being permitted to schedule the exam (and every subsequent exam regardless of prior accommodations)—a process which typically takes at least 60 days. The MSPRB knew this. Mr. Polito brought this issue to the attention of Dr. Nobay in an email dated May 5, 2023. Dr. Nobay replied that Mr. Polito would need to submit yet another request to the MSPRB if he wished to "make any further delays to [his] USMLE Step 1 exam" even though, in writing this email to Dr. Nobay, Mr. Polito was already making this request known in writing.

**XI.     Mr. Polito is Coerced into Forgoing UR Approved Accommodations**

100.     On May 15, under pressure to ensure some accommodations before the July 2023 deadline, and under threats of dismissal, Mr. Polito was coerced into forgoing the URSMD accommodations approved in his accommodations letter, accommodations that were also recommended by UR's UHS physician.

101.     Mr. Polito therefore submitted an accommodations request to the NBME requesting additional break time (10 minutes per each exam hour) and medically unreasonable test time accommodations (50% additional test time versus the 100% additional test time recommended by his physician, evidenced in documentation, and approved by URSMD).

- 23 -

**XII.    UR Wants Mr. Polito to Drop His NBME Accommodations Requests and Retaliates Following His Opposition.**

102.     The MSPRB did not reply to Mr. Polito's May 5, 2023 written request that it accommodate the NBME's timeline for reviewing accommodation requests.

103.     Then, knowing Mr. Polito's coerced request for medically unreasonable Step 1 exam accommodations was still under review by the NBME, on July 3, 2023, Dr. Kodjo continued to threaten Mr. Polito by emailing him a copy of the MSPRB's May 3rd letter, highlighting the language stating that he must take the exam by the end of July 2023 or face possible dismissal.

104.     During a subsequent meeting on July 5, 2023, Mr. Polito expressed to Dr. Kodjo that it was improper for her and URSMD to continue to threaten him with dismissal after Mr. Polito opposed sitting for an exam without URSMD approved accommodations and after he repeatedly raised discrimination and harassment concerns.  Mr. Polito further expressed that it was improper for such threats with full knowledge that it was impossible for him to register for the Step 1 exam before the NBME's review of these coerced inadequate accommodations requests.

105.     Mr. Polito further informed Dr. Kodjo of ongoing barriers and concerns with the NBME and even directed her to the USMLE website, which is co-owned by the NBME, which explicitly and unlawfully discriminates where students requesting accommodations in the form of "separate testing rooms" will be subjected to inferior testing environments when compared to the "standard" testing area.[2]

---

[2] *Test Accommodations Common Questions*, USMLE, *https://www.usmle.org/common-questions/test-accommodations* (last visited Oct. 23, 2024).

106.    According to a notice published on the USMLE website,

> separate testing rooms at Prometric test centers are not guaranteed to be 'distraction-free' or any quieter than the standard Prometric testing area, which is designed to provide a reasonably quiet environment that is conducive to high-stakes, standardized test administrations. The separate room is typically located next to the check-in or proctors' station, which can be busy. A window between the separate room and the check-in or proctors' station is there for security measures.[3]

107.    Upon information and belief, Dr. Kodjo failed to promptly report (within 48 hours) these concerns as required by UR policy.  No one from UR reached out to Mr. Polito regarding his concerns.  As a result, URSMD failed to investigate these concerns in accordance with UR policy.

108.    The following week, rather than respond to Mr. Polito's clear articulation of the unreasonable demands that URSMD was placing on him, outrageously, on July 12, 2023, Dr. Kodjo emailed Mr. Polito requesting that he sit for the exam *without any accommodations*.

109.    Dr. Kodjo's request that an individual with a disability to forgo accommodations or face dismissal, is, in and of itself, highly offensive—and illegal.

110.    Considering that URSMD students only have three opportunities to take the Step 1 exam before being entirely dismissed from the program, and a maximum of 4 lifetime attempts for the Step 1 exam under USMLE policy, this request reflects total indifference with respect to Mr. Polito's civil rights and the impact such violations would have on Mr. Polito's career and life.

111.    Mr. Polito replied to Dr. Kodjo on July 12, 2023, rejecting and opposing her request that he sit for the Step 1 exam without medically necessary accommodations.  Upon

---

[3] *Id.*

information and belief, Dr. Kodjo reported this information back to Dr. Nobay, the spokesperson for the MSPRB.  Dr. Kodjo and Dr. Naby are always in close, routine communication.

112.    The MSPRB retaliated.  On July 13, 2023, Mr. Polito received another letter from the MSPRB (drafted and emailed by Dr. Nobay) now acknowledging it was aware that Mr. Polito's Step 1 exam request for accommodations was still under review by the NBME. Nevertheless, the MSPRB threatened Mr. Polito with an immediate leave of absence and dismissal for failure to comply with their demands, regardless of the NBME's review process. Tellingly, this letter was issued the very next day after Mr. Polito rejected Dr. Kodjo's request that he sit for the exam without URSMD approved accommodations.

**XIII.  Mr. Polito Continues to File Additional Complaints of Discrimination and Harassment.**

113.    Mr. Polito continued to submit internal complaints of disability-based discrimination and retaliation to URSMD in accordance with UR policy.  According to UR's PADH, "Complaints arising under this Policy may be made to the Office of Equity and Inclusion or *verbally or in writing* to an individual's department chair, dean, director, immediate supervisor, the Office of Human Resources, any University Ombuds, or the Office of Counsel" (emphasis added).

114.    On July 14, 2023, Mr. Polito sent a letter to Dr. Nobay and the MSPRB outlining grievances—specifically, the April 4 meeting where Mr. Polito subjected to Dr. Ogie's discriminatory comments and where not one other member of the MSPRB objected.  Within the same letter, he requested a medical leave of absence due to continued harm caused by URSMD's handling of his requests for accommodation.

115.    While all members of the MSPRB received a copy of this letter, upon information and belief, no one reported these reported concerns of discrimination and harassment as required under UR policy. No one from UR reached out to Mr. Polito regarding his concerns until after Mr. Polito had later escalated to these concerns to the OEI. As a result, UR failed to investigate these concerns in accordance with UR policy.

**XIV.    UR Retaliates with Conduct Including Removal of the Medical Students ADA Ombudsperson from Student Handbook.**

116.    On July 17, 2023, Dr. Nobay sent a general (non-medical) leave of absence form to Mr. Polito with prefilled dates of July 17, 2023 – January 7, 2024. Mr. Polito had not previously provided any dates to URSMD regarding how long he would need a leave.

117.    Relying on URSMD's Student Handbook (updated June 1, 2023) and the document regarding ADA Ombudsperson previously received together directing students with disabilities to the Medical Students ADA Ombudsperson (Dr. Susan Hetherington, PhD), Mr. Polito emailed Dr. Hetherington on July 18, 2023, to request assistance. He received no reply.

118.    On July 18, 2023, Dr. Nobay and the MSPRB sent Mr. Polito (cc Registrar and Financial Aid) a letter writing in part: "You are requesting a medical Leave of Absence (mLOA) effective July 17 2023 – January 7 2024." This statement was, and is, false.

119.    On July 19, 2023, Mr. Polito emailed the Associate Vice Provost of Disability Compliance, Lynnett Van Slyke, with questions regarding the Medical Students ADA Ombudsperson.

120.    On July 23, 2023, Mr. Polito emailed Dr. Nobay with questions regarding the Medical Students ADA Ombudsperson. Although the position and role of the Medical Students ADA Ombudsperson was outlined within the URSMD Student Handbook (as it had been since

- 27 -

before Mr. Polito's matriculation) and within the purview of the ADSA and the URSMD, in her

reply on July 24, 2023, Dr. Nobay refused to answer Mr. Polito's question and deferred to the

University Ombuds.

121.    Upon information and belief, within one week, sometime between July 24 and

July 31, 2023, Dr. Nobay and URSMD retaliated and eliminated the Medical Students ADA

Ombudsperson from the Student Handbook.  Whereas the June Student Handbook (Updated:

June 1, 2023) had the Medical Students ADA Ombudsperson section, a revised Student

Handbook (updated: July 28, 2023), downloaded July 31, 2023, was found to have the Medical

Students ADA Ombudsperson section eliminated.

122.    In addition, Dr. Nobay and URSMD scrubbed the word "Ombudsperson"

throughout the entire Student Handbook and simultaneously eliminated the responsibility that the

Disability Access Coordinator "meet with each student once a semester to review the

accommodations and any requests for modifications."

123.    The changes to the Student Handbook were made surreptitiously.

124.    Such conduct by URSMD is strikingly similar to actions taken by URSMD

around 2015 where it changed the URSMD Student Handbook in interference with the rights of a

medical student with a disability.  This conduct prompted an investigation by the U.S.

Department of Education, New York Office for Civil Rights ("OCR") that resulted in a resolution

agreement.  *See* **Exhibit 2** (2016 OCR Determination Letter); **Exhibit 3** (2016 OCR Resolution

Agreement).

125.    During a subsequent August 1, 2023 meeting with Provost Van Slyke, and in

direct contradiction to Dr. Nobay's July 24 email, Mr. Polito was informed that neither she

(Provost Van Slyke) nor University Ombuds was involved in the Medical Students ADA

Ombudsperson role, that the position was a separate role within the Medical School, and that the Medical Students ADA Ombudsperson did not report to the UR Ombuds Office. Therefore, upon information and belief, Dr. Nobay lied to Mr. Polito or sent an intentionally misleading statement.

126.    During this meeting with Provost Van Slyke, Mr. Polito also expressed concerns of discrimination and harassment. Upon information and belief, Provost Van Slyke failed to promptly report these concerns as required by UR policy. No one from UR reached out to Mr. Polito regarding his concerns until after Mr. Polito escalated to these concerns to the OEI. As a result, UR failed to investigate these concerns in accordance with UR policy.

**XV.    UR Fails to Take Requested Protective Measures and Retaliates by Withdrawing Mr. Polito from URSMD for Opposing Unlawful Actions.**

127.    On July 27, 2023, Mr. Polito submitted a complaint to the OEI, in which he noted the existence of systemic and pervasive violations of his civil rights under federal and state laws. Within the complaint, he requested protective measures in accordance with UR policy—that UR and URSMD maintain the status quo pending a global resolution of his concerns. The OEI never implemented any protective measures as requested.

128.    On July 27, 2023, the same day, and only hours after Mr. Polito submitted his written complaint to the OEI), Mr. Polito received a hostile email from Dr. Nobay demanding he provide support for their pre-set medical leave of absence by 8 am on July 31st or an update—or be placed on a mandatory leave of absence. Given the same day proximity in time between Mr. Polito's OEI complaint and Dr. Nobay's threatening email, it is believed that there was a breach in confidentiality between the OEI and the URSMD administration. Mr. Polito provided an

update to Dr. Nobay on July 30, 2023 and notice that he was requesting protective measures pending a global resolution to all issues.

129.    Though Mr. Polito provided a timely update to Dr. Nobay, the MSPRB retaliated by issuing a letter on August 8, 2023, placing Mr. Polito on a retroactive, involuntary leave of absence—effective July 31, 2023 until January 8, 2024.  The MSPRB stated they were terminating Mr. Polito's disability coverage and required that he turn in his pager and URSMD Student ID badge. The MSPRB further required that Mr. Polito cease his opposition to the involuntary leave of absence by submitting a request to return by November 8, 2023 or face withdrawal.

130.    URSMD removed Mr. Polito from all medical student class email lists.

131.    The result was an effective termination of Mr. Polito's medical education, with no opportunity to appeal.

132.    Multiple UR policies indicate that students and employees only turn in their university issued ID badges upon definitive separation from university (e.g. termination, dismissal, etc.).  By placing Mr. Polito on a fixed leave of absence, URSMD unilaterally ended Mr. Polito's Step 1 exam registration and ability to seek disability accommodations through the NBME.

133.    The NBME requires a testing applicant to be "enrolled" in a medical school in order to register for the Step 1 exam and it relies on each medical school's definition of "enrolled" to determine eligibility.  According to URSMD policy, students placed on leaves of absence by are not deemed to be "enrolled."  Therefore, due to URSMD's retaliatory placement of Mr. Polito on a mandatory leave of absence, Mr. Polito was no longer eligible to register for the Step 1 exam or make any further accommodation requests through the NBME.

134.    UR shielded its actions from appeal.  According to the Student Handbook, the only appealable decisions of the MSPRB are: (1) requirement to repeat a full academic year, (2) required leave of absence of a year or more, and (3) dismissal.

135.    On its "Medical Education Admissions" webpage, URSMD makes written promises and assurances that it is a "medical school fully accredited by the Liaison Committee on Medical Education (LCME)".

136.    In holding itself out as an LCME accredited medical school, URSMD promised that it complied with all LCME accreditation standards.

137.    URSMD has failed to uphold multiple published LCME accreditation standards, including Standard 9.9, "Student Advancement and Appeal Process", which requires that medical schools "[ensure] that there is a fair and formal process for taking any action that may affect the status of a medical student."

138.    The LCME's definition of "fair and formal process" includes an "opportunity to appeal *any* adverse decision." (emphasis added).

139.    For more than one year, Mr. Polito had been submitting internal complaints of discrimination and harassment that were neither reported by UR administration nor investigated by UR.

140.    Even after UR failed to take protective measures as requested under UR policy, Mr. Polito met with an OEI investigator, Ms. Nicole Ladner, on August 31, 2023.  During that meeting, Mr. Polito requested that OEI address a conflict of interest—specifically, that OEI is under the direction and supervision of Dr. Adrienne Morgan, who is also a member of the MSPRB.

141.    Around September 6, 2023, Mr. Polito sent an email to URSMD requesting copies of all the Student Handbooks as well as any changes made. On September 7, 2023, Dr. Nobay replied that she would provide all versions. Neither Dr. Nobay nor URSMD ever provided copies of these Student Handbooks as promised.

142.    In an email dated September 13, 2023, Ms. Lader informed Mr. Polito that UR decided that it would use an independent external investigator to review Mr. Polito's concerns of discrimination and harassment.

143.    On October 3, 2023, after many weeks had passed without any updates, Mr. Polito requested an update from Ms. Ladner. Ms. Ladner replied that she would connect Mr. Polito with this independent investigator in a "week or so" but it was not until October 17, two weeks later, that Ms. Lader replied, announcing that they had retained a known university defense lawyer to conduct its investigation.

144.    By that time, because more than 6 weeks had passed since Mr. Polito first met with OEI investigator Ms. Ladner on August 31, and more than 5 weeks had passed since UR informed Mr. Polito of its decision to utilize an external investigator, Mr. Polito was compelled to consult legal counsel to assist with these matters.

145.    Because UR and URSMD continually failed to implement protective measures as requested under UR policy, Mr. Polito, through counsel, submitted an additional written complaint, pursuant to UR policy, in a letter to the UR Office of Counsel, dated November 4, 2023.

146.    According to Mr. Polito's communications with his counsel, the UR Office of Counsel advised Mr. Polito's counsel that she would investigate issues and questions presented and respond to Mr. Polito's counsel by November 29. Upon information and belief, the UR

- 32 -

Office of Counsel also promised Mr. Polito's counsel that URSMD's arbitrary November 8 deadline had been paused until an agreement could be worked out.

147.    According to Mr. Polito's communications with his counsel, the UR Office of Counsel never reported back on these issues and questions as promised.  As a result, Mr. Polito's counsel presented the UR Office of Counsel with a confidential offer for settlement, in a letter dated November 29, 2023.

148.    Following this letter, sometime around December 4, 2023, URSMD quietly added Mr. Polito back to the email lists that it had removed him from around August 2023.  This was an attempt by UR and URSMD to quietly walk back some of its retaliatory actions effectively terminating Mr. Polito's medical education.

149.    Upon information and belief, around December 8, 2023, the UR Office of Counsel then responded to Mr. Polito's counsel that it would consider the offer to settle and reply accordingly.  But, instead of addressing or responding to the issues and concerns presented, and with no mutual agreement in place, the UR Office of Counsel stated that UR would withdraw Mr. Polito from URSMD.

150.    UR then hired additional defense counsel, Mr. Eric Ward, then of Ward Greenberg Heller & Reidy LLP.  Around December 20, 2023, Mr. Ward advised Mr. Polito's counsel that UR did nothing wrong.

151.    On January 16, 2024, Mr. Polito received a letter from URSMD stating that it had withdrawn Mr. Polito from the medical school.  The close of this letter, authored by Dr. Nobay, stated, "[p]lease do not hesitate to reach out for questions, clarifications or anything else you may need."

152.    When Mr. Polito promptly responded in a January 23, 2024 letter with questions and concerns, including a statement that he was still waiting for copies of the Student Handbooks he was promised, Dr. Nobay replied with remark about Mr. Polito being assisted by legal counsel regarding discrimination and harassment concerns and then refused to respond to any of Mr. Polito's cited questions and concerns.

153.    Around October 22, 2024, Mr. Polito received a letter from HHS indicating a default status on his contract.

**XVI.    UR Continues to Retaliate by Abruptly Terminating Mr. Polito's Medical Care at UHS**

154.    On January 22, 2024, Mr. Polito sent an electronic message to his primary care physician, Dr. Behrman, a UHS provider, seeking refills for his medications. On January 23, 2024, Dr. Behrman replied to Mr. Polito indicating that he would electronically refill Mr. Polito's medications and requested that he schedule an appointment to be seen whenever he had the opportunity to do so.

155.    Thereafter, Mr. Polito contacted UHS multiple times to schedule an appointment with Dr. Behrman but was denied by UHS.

156.    At no time did UHS give any notice that it was terminating care with Mr. Polito.

157.    Mr. Polito ran out of his medications causing him to abruptly cease medication therapy (for a Schedule II substance under the Controlled Substances Act) with no taper, and in the absence of medical supervision. Mr. Polito experienced severe withdrawal symptoms, including anxiety, extreme fatigue, depression, and worsening symptoms of ADHD.

158.    In seeking to establish medical care elsewhere, Mr. Polito faced difficulty finding

a provider with appropriate expertise for the treatment of ADHD without an extended waitlist.

Many providers he called were scheduling appointments in November 2024, at the earliest.

159.    On July 16, 2024, Mr. Polito sent a message to Dr. Behrman, writing in part,

> As you may be aware, I have been trying to schedule an appointment
> to be seen with you regarding my need for medication refill of
> [medications]. As of this time, I have received no written notice of
> discontinuation of care by UHS. I have also been attempting to seek
> continued care elsewhere. I have contacted multiple practices, and,
> as of this time, I am unable to be seen by a new provider until
> November 5, 2024. I have requested that I be placed on a waiting
> list to be seen earlier in the event of a cancellation, etc. I am
> requesting that you please refill my medications…through
> November, which is the earliest that I can be seen by another
> provider. If you would like to see me in order to provide these refills,
> I am happy to come into your office to be seen. I believe this is
> reasonable given the circumstances.

160.    On July 19, 2024, Dr. Behrman replied, in part, with the following: "my hands are

a bit tied here…I haven't gotten a clear answer as to whether or not you can still be seen here."

161.    Dr. Kodjo was promoted to Vice Provost and Director of UHS effective July 1,

2024. In other words, the same individual pressuring Mr. Polito to forgo disability-related

accommodations was the likely same individual interfering with the physician-patient

relationship between Mr. Polito and his primary care physician.

## FIRST CAUSE OF ACTION
### Discrimination under the Americans with Disabilities Act
### By Plaintiff Against UR

162.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as

if fully set forth herein.

163.    Congress enacted the ADA after finding that persons with disabilities have been

"subjected to discrimination" to an extent that "society has tended to isolate and segregate

- 35 -

individuals with disabilities" which continues to be a "serious and pervasive social problem". 42 U.S.C. § 12101(a).

164.    The purpose of the ADA is the creation of a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" along with "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities". 42 U.S.C. § 12101(b).

165.    Title III of the ADA, as amended, provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

166.    Plaintiff was, at all relevant times, and is a qualified individual with a disability within the meaning of the ADA.  In a 2020 accommodations letter, Defendant UR previously determined that Plaintiff was a qualified individual with a disability as defined by the ADA.

167.    Defendant UR is subject to Title III of the ADA.  At all relevant times, Defendant UR owned, leased, or operated a place of "public accommodation" within the meaning of Title III and its implementing regulations.  Defendant UR operates a private university with undergraduate and post graduate programs and a large hospital.

168.    Plaintiff was denied the opportunity to participate in and/or benefit from Defendant UR's service, programs, or activities or was otherwise discriminated against by Defendant UR on the basis of disability in the following ways.

169.    Defendant UR denied Plaintiff its own approved accommodations on a program required exam.

- 36 -

170.    On multiple occasions between April 2022 and July 2023, Defendant refused to consider and summarily denied Plaintiff's requests for schedule adjustments as reasonable modifications in policies, practices, and procedures.

171.    Between July 2023 and January 2024, Defendant placed Plaintiff on a mandatory leave of absence and subsequently withdrew him from his medical program because he opposed sitting for the Step 1 exam without URSMD approved reasonable accommodations and for failure to schedule the Step 1 exam even though it was impossible to do so during the NBME's review of Plaintiff's request for accommodations.  Defendant UR knew it was impossible.

172.    Defendant UR failed to offer its program in the most integrated setting appropriate for the needs of Plaintiff and his disability.  Such conduct includes, among other actions, Defendant UR's repeated refusal to even consider Plaintiff's requests for schedule adjustments and failing to coordinate study and scheduling timelines between its own curriculum and known issues with the NBME in processing and approving disability-related requests for accommodations.

173.    Defendant UR failed to take all necessary steps to ensure that Plaintiff would not be excluded, denied services, or treated differently than other medical students, due to the absence of auxiliary aids and services.  Such conduct includes, among other actions, Defendant UR's repeated denial of Plaintiff's request that academic materials be made available to him in printed mediums.

174.    Through contractual, licensing, or other arrangements with the NBME, Defendant UR denied Plaintiff the full benefit of the accommodations it had approved in August 2020—accommodations that are necessary for meaningful and equal access to the Step exams.

175.    Defendant UR is aware that the NBME has a long history of denying accommodations for medical students with disabilities but continues to remain silent on the issue. Research indicates that over 50% of all Step 1 exam accommodations requests are denied by the NBME.[4] Defendant UR has made no effort to ensure its own approved accommodations are implemented throughout its entire required curriculum. Defendant UR has refused Plaintiff's request for an official UR letter of support endorsing its own approved accommodations as other medical schools have provided for their students. Defendant UR has refused to grant Plaintiff a pause without academic penalty in his academic studies in order to obtain additional medical and legal support to address these known issues with the NBME himself.

176.    Defendant UR utilized standards, criteria, or methods of administration that had the effect of discriminating and/or perpetuating discrimination of Plaintiff. Such unlawful conduct includes, among other actions: (1) refusing to even consider striking the June 2022 Step 1 exam as an attempt on his academic record where even the limited approved accommodations were not provided; (2) activating its one-year take and pass policy following Plaintiff's Step 1 exam attempt in a setting where Defendant UR's own approved accommodations were not provided; and (3) refusing to consider requests to alter this policy.

177.    Defendant UR failed to report and investigate Plaintiff's numerous concerns of discrimination and harassment first reported in 2022.

178.    Defendant UR failed to take requested protective measures in accordance with UR policy.

---

[4] *See* Kristina H Peterson *et al.*, *Impact of USMLE Step-1 Accommodation Denial on US Medical Schools: A National Survey*, PLOS ONE (Apr. 14, 2022), *https://doi.org/10.1371/journal.pone.0266685.*

179.    Defendant UR subjected Plaintiff to disparaging statements regarding his disability.

180.    Defendant UR pressured Plaintiff to request accommodations inferior to those already approved by Defendant UR.

181.    Defendant UR pressured Plaintiff to forgo approved accommodations.

182.    Defendant UR deleted the Medical Students ADA Ombudsperson from the Student Handbook after Plaintiff requested their assistance.

183.    All of the accommodations that Plaintiff requested were reasonable.

184.    None of the requests would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

185.    Defendant UR failed to demonstrate that such modifications would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

186.    Defendant UR could have reasonably provided all aids, benefits, services, programs, and activities in an accessible manner and on an equal basis to Plaintiff, to allow him a full, meaningful, and equal opportunity to participate.

187.    Defendant UR did not make a good faith effort to accommodate Plaintiff's disability.

188.    Defendant UR failed to engage in an interactive process.

189.    Defendant UR failed to communicate with Plaintiff meaningfully and in good faith concerning his disability and requested accommodations.

190.     Through the acts and omissions of Defendant UR, its employees, and agents described herein, Defendant UR, with intent, deliberate indifference, and reckless disregard, violated the ADA and its implementing regulations.

191.     Defendant UR is liable for the acts and omissions of its employees and agents.

192.     As a direct and proximate result of the aforementioned acts and omissions, Plaintiff has been excluded from participation in, denied the benefits of, and subjected to discrimination at Defendant UR's place of public accommodation in violation of the ADA and its implementing regulations because of Plaintiff's disability.

193.     As a direct and proximate result of the aforementioned acts and omissions by Defendant UR, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

194.     Plaintiff is entitled to declaratory and injunctive relief, and reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

## SECOND CAUSE OF ACTION
### Discrimination under the Americans with Disabilities Act
### By Plaintiff Against NBME

195.     Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

196.     Title III of the ADA, as amended, provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

privileges, advantages, or accommodations of any place of public accommodation by any person

who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. §

12182(a); 28 C.F.R. § 36.201(a).

197.    Plaintiff was, at all relevant times, and is a qualified individual with a disability

within the meaning of the ADA. In granting partial accommodations, but largely (and

unreasonably) rejecting others, Defendant NBME was (at minimum) regarding Mr. Polito has

having an impairment meeting the definition of disability under the ADA.

198.    Plaintiff was eligible to take the exam, paid the NBME's application fee and

submitted proper documentation.

199.    Defendant NBME is subject to Title III of the ADA. At all relevant times,

Defendant NBME owned, leased, or operated a place of "public accommodation" within the

meaning of Title III and its implementing regulations or was otherwise an entity subject to the

ADA. Defendant NBME is a service establishment whose services include selling medical

education related exams and administering USMLE tests and accommodations for the Step

exams.

200.    Under Title III, a person or entity offering "examinations or courses related to

applications, licensing, certification, or credentialing for secondary or post-secondary education,

professional, or trade purposes shall offer such examinations or courses in a place and manner

accessible to persons with disabilities or offer alternative accessible arrangements for such

individuals." 42 U.S.C. § 12189.

201.    Plaintiff was denied the opportunity to participate in and/or benefit from

Defendant NBME's service, programs, or activities or was otherwise discriminated against by

Defendant NBME on the basis of disability in the following ways.

- 41 -

202.    Defendant NBME reviews and processes all requests for accommodations for the Step exams.

203.    Defendant NBME is a co-sponsor of the USMLE.

204.    Defendant NBME denied Plaintiff's request for 100% additional test time, additional breaks (10 minutes per each exam hour), use of a physical writing instrument and notepaper, despite extensive medical documentation supporting these requests.

205.    Defendant NBME unlawfully disadvantaged Plaintiff by splitting the exam from seven 40-question blocks to fourteen 20-question blocks. This segmentation reduced the amount of proportional time Plaintiff could utilize for each 40-question block than similarly situated students without disability accommodations. Plaintiff never requested such division or unequal treatment as an accommodation.

206.    Defendant NBME denied or otherwise failed to provide a reduced distraction environment as requested. Plaintiff was placed in a separate testing room with a window adjacent to the busy check-in and proctors' station offering no individual workstation privacy carrel similar to students in the general testing area. Rather than a reduced distraction environment as requested, this testing arrangement was an increased distraction environment.

207.    Defendant NBME states on its USMLE website that any person requesting a separate testing room will typically be "placed next to the check-in or proctors' station, which can be busy." USMLE, *supra*.

208.    Defendant NBME states on its USMLE website that separate testing rooms will have a "window between the separate room and the check-in or proctors' station" whereas the general testing area provides "individual workstation carrels...to shield test-takers from visual distractions." *Id.*

- 42 -

209.    Defendant NBME is publishing statements that it will not provide reasonable accommodations and will disadvantage Plaintiff in need of reduced distraction environments compared to the general testing area.

210.    Defendant NBME requires Plaintiff to submit a new accommodations request for every Step exam in the series (Step 1, Step 2, and Step 3) and for every exam attempt.  It does not matter if the individual is not seeking to modify previously approved accommodations and does not matter how permanent the disability is.  Plaintiff's disability is permanent and has existed since childhood.  Considering the time it takes the NBME to review each accommodation request in the context of medical education and the fast pace environment of clinical rotation time schedules, the requirement that Plaintiff request accommodations for each and every exam and attempt is unreasonable.  Moreover, this arrangement places Plaintiff at a scheduling disadvantage compared to other test takers.

211.    Defendant NBME's accommodations request process and accommodations request form are discriminatory.

212.    All the accommodations that Plaintiff requested were reasonable. None of the requests would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

213.    Defendant NBME could have reasonably provided all aids, benefits, services, programs, and activities in an accessible manner and on an equal basis to Plaintiff, to allow him a full, meaningful, and equal opportunity to participate.

214.    Defendant NBME did not make a good faith effort to accommodate Plaintiff's disability.

215.    Defendant NBME failed to engage in an interactive process.

- 43 -

216.     Defendant NBME failed to communicate with Plaintiff meaningfully and in good faith concerning his disability and requested accommodations.

217.     Through the acts and omissions of Defendant NBME, its employees, and its agents described herein, Defendant NBME, with intent, deliberate indifference, and reckless disregard, violated the ADA and its implementing regulations.

218.     Defendant NBME is liable for the acts and omissions of its employees and agents.

219.     As a direct and proximate result of the aforementioned acts, Plaintiff has been excluded from participation in, denied the benefits of, and subjected to discrimination by Defendant NBME in violation of the ADA and its implementing regulations.

220.     As a direct and proximate result of the aforementioned acts, Defendant NBME has denied Plaintiff, and continues to deny Plaintiff, the ability to sit for the Step exams in an accessible manner, in violation of the ADA and its implementing regulations, because of Plaintiff's disability.

221.     As a direct and proximate result of the aforementioned acts and omissions by Defendant NBME, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used for his medical education.

222.     Plaintiff is entitled to declaratory and injunctive relief, and reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

### THIRD CAUSE OF ACTION
#### Discrimination under the Rehabilitation Act of 1973
#### By Plaintiff Against UR

223.     Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

224.     The RA is one of the first civil rights laws passed by Congress for the protection of individuals with disabilities.  Congress has identified persons with disabilities as "one of the most disadvantaged groups in society."  29 U.S.C. § 701(a)(2).

225.     Section 504 prohibits discrimination based on disability under any program or activity that receives Federal financial assistance.  29 U.S.C. § 794.

226.     All remedies, procedures, and rights under Section 504 are "available to any person aggrieved by any act or failure to act by any recipient of Federal assistance" under 29 U.S.C. 794.  29 U.S.C. § 794a(a)(2).

227.     Under Section 504 implementing regulations, "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance."  34 C.F.R. 104.4(a).

228.     "Qualified individual with a disability" is replaced and used interchangeably with "qualified handicapped person."  34 C.F.R. 104.3(j).

229.     At all relevant times, Plaintiff has been a "qualified individual with a disability" and "qualified handicapped person" with disabilities and impairments as defined by Section 504 implementing regulations.  In 2020, Defendant UR determined that Mr. Polito was a qualified individual with a disability as defined by the RA.

- 45 -

230.    "Qualified handicapped person" in the postsecondary setting is means, "a handicapped person who meets the academic and technical standards requisite to admission or participation in the recipient's education program or activity. 34 C.F.R. 104.3(l)(3). Plaintiff was "otherwise qualified" because he was an admitted medical student, matriculating at or around August 2020, was in good standing having received high honors in the clerkship immediately preceding the unlawful conduct prompting this Complaint, and could meet all academic and technical standards with reasonable accommodations and in the absence of discrimination.

231.    Defendant UR is subject to Section 504 of the RA. At all relevant times, Defendant UR operated a "program or activity receiving Federal financial assistance" as defined by Section 504 implementing regulations. As a university, all of Defendant UR's operations are defined as a "program or activity." 34 C.F.R. 104.3(k).

232.    Defendant UR receives Federal financial assistance because it issues and receives grants and loans from the U.S. Department of Education. Defendant UR has also received Federal financial assistance from HHS because Mr. Polito was a scholar under the NHSC Scholarship Program.

233.    Plaintiff was denied the opportunity to participate in and/or benefit from Defendant UR's service, programs, or activities or was otherwise discriminated against by Defendant UR on the basis of disability in the following ways.

234.    Defendant UR denied Plaintiff its own approved accommodations on a required exam.

235.    On multiple occasions between April 2022 and July 2023, Defendant refused to consider and summarily denied Plaintiff's requests for schedule adjustments as reasonable modifications in policies, practices, and procedures.

236.    Between July 2023 and January 2024, Defendant placed Plaintiff on a mandatory leave of absence and subsequently withdrew him from his medical program because he opposed sitting for the Step 1 exam without URSMD approved reasonable accommodations and for failure to schedule the Step 1 exam even though it was impossible to do so during the NBME's review of Plaintiff's request for accommodations.  Defendant UR knew it was impossible.

237.    Defendant UR failed to offer its program in the most integrated setting appropriate for the needs of Plaintiff and his disability.  Such conduct includes, among other actions, Defendant UR's repeated refusal to even consider Plaintiff's requests for schedule adjustments and failing to coordinate study and scheduling timelines between its own curriculum and known issues with the NBME in processing and approving disability-related requests for accommodations.

238.    Defendant UR failed to take all necessary steps to ensure that Plaintiff would not be excluded, denied services, or treated differently than other medical students, due to the absence of auxiliary aids and services. Such conduct includes, among other actions, Defendant UR's repeated denial of Plaintiff's request that academic materials be made available to him in printed mediums.

239.    Through contractual, licensing, or other arrangements with the NBME, Defendant UR denied Plaintiff the full benefit of the accommodations it had approved in August 2020— accommodations that are necessary for meaningful and equal access to the Step exams.  As previously noted, Defendant UR is aware that the NBME has a long history of denying accommodations for medical students with disabilities but continues to remain silent on the issue.  Defendant UR has made no effort to ensure its own approved accommodations are implemented throughout its entire required curriculum.  Defendant UR has refused Plaintiff's

request for an official UR letter of support endorsing its own approved accommodations as other medical schools have provided for their students. Defendant UR has refused to grant Plaintiff a pause without academic penalty in his academic studies in order to obtain additional medical and legal support to address these known issues with the NBME himself.

240.    Defendant UR utilized standards, criteria, or methods of administration that had the effect of discriminating and/or perpetuating discrimination of Plaintiff. Such unlawful conduct includes, among other actions: (1) refusing to even consider striking the June 2022 Step 1 exam as an attempt on his academic record where even the limited approved accommodations were not provided; (2) activating its one-year take and pass policy following Plaintiff's Step 1 exam attempt in a setting where Defendant UR's own approved accommodations were not provided; and (3) refusing to consider requests to alter this policy.

241.    Defendant UR failed to promptly report and investigate Plaintiff's numerous concerns of discrimination and harassment first reported in 2022.

242.    Defendant UR failed to take requested protective measures in accordance with UR policy.

243.    Defendant UR subjected Plaintiff to disparaging statements regarding his disability.

244.    Defendant UR pressured Plaintiff to request accommodations inferior to those already approved by Defendant UR.

245.    Defendant UR pressured Plaintiff to forgo approved accommodations.

246.    Defendant UR deleted the Medical Students ADA Ombudsperson from the Student Handbook after Plaintiff requested their assistance.

247.    Defendant UR engaged in prohibited discriminatory actions and acted in bad faith when it when it failed to uphold promises in a May 2, 2016 Resolution Agreement with the U.S. Department of Education that it would ensure: "that only Disability Services and Support Office and/or other designated University/School staff, including the School's Disability Access Coordinator, *with the appropriate expertise and training*, may review and make determinations in response to requests for academic adjustments and auxiliary aids; and, that this responsibility must not be delegated to individuals, including course faculty, who are not authorized to make such determinations" (emphasis added). **Exhibit 3**.

248.    According to a research report commissioned by the Association of American Medical Colleges ("AAMC"), appropriate expertise and training for accommodating medical students with disabilities means an individual who is *specially trained* in both disability law *and* medical school curriculum.[5]   Dr. Nobay was appointed as URSMD's "Disability Access Coordinator" at or around 2021.  Dr. Nobay was authorized to review and make determinations regarding requests for academic adjustments and auxiliary aids.  Upon information and belief, Dr. Nobay did not possess the appropriate expertise and training for this role in violation of this prior resolution agreement.

249.    UR further authorized the MSPRB to review and make determinations in response to requests for academic adjustments and auxiliary aids.  Upon information and belief, the MSPRB members did not possess the appropriate expertise and training for this role in violation of this prior resolution agreement.

250.    All of the accommodations that Plaintiff requested were reasonable.

---

[5] Lisa M. Meeks *et al.*, *Accessibility, Inclusion, and Action in Medical Education: Lived Experiences of Learners and Physicians With Disabilities* 47 (2018).

251.    None of the requests would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

252.    Defendant UR failed to demonstrate that such modifications would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

253.    Defendant UR could have reasonably provided all aids, benefits, services, programs, and activities in an accessible manner and on an equal basis to Plaintiff, to allow him a full, meaningful, and equal opportunity to participate.

254.    Defendant UR did not make a good faith effort to accommodate Plaintiff's disability.

255.    Defendant UR failed to engage in an interactive process.

256.    Defendant UR failed to communicate with Plaintiff meaningfully and good faith concerning his disability and requested accommodations.

257.    Through the acts and omissions of Defendant UR, its employees, and its agents described herein, Defendant UR, with intent, deliberate indifference, and reckless disregard, violated the RA and its implementing regulations.

258.    Defendant UR is liable for the acts and omissions of its employees and agents.

259.    As a direct and proximate result of the aforementioned acts, Plaintiff has been excluded from participation in, denied the benefits of, and subjected to discrimination under Defendant UR's programs and activities in violation of the RA and its implementing regulations.

260.    As a direct and proximate result of the aforementioned acts and omissions by Defendant UR, its employees, and its agents, Plaintiff has suffered injuries, including but not

limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened

psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal

from his medical program, loss of his remaining scholarship for medical school, lost opportunity

to become a physician, breach of contract with HHS, and now must repay the scholarship funds

and federal financial assistance loans used at Defendant UR's institution.

261.    Plaintiff is entitled to injunctive relief, compensatory damages, and reasonable

attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief

section below.

**FOURTH CAUSE OF ACTION**
**Discrimination under the Rehabilitation Act of 1973**
**By Plaintiff Against NBME**

262.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as

if fully set forth herein.

263.    Under Section 504 implementing regulations, "[n]o qualified handicapped person

shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or

otherwise be subjected to discrimination under any program or activity which receives Federal

financial assistance." 34 C.F.R. 104.4(a).

264.    At all relevant times, Plaintiff has been a "qualified individual with a disability"

and "qualified handicapped person" with disabilities and impairments as defined by Section 504

implementing regulations.

265.    In granting partial accommodations, but unreasonably rejecting others, Defendant

NBME was (at minimum) regarding Mr. Polito has having an impairment meeting the definition

of disability under the RA.

266.    Plaintiff was eligible to take the exam, paid the NBME's application fee and submitted proper documentation.

267.    Defendant NBME is subject to Section 504 of the RA.  Defendant receives Federal financial assistance.  Plaintiff's application fee came from monies sourced through federal loans, along with a special exam fee allocation from HHS under the NHSC Scholarship Program.  Defendant NBME receives federal monies through Defendant UR's purchase of its exam materials, such as shelf exams, using student sourced tuition and fees.

268.    Plaintiff was denied the opportunity to participate in and/or benefit from Defendant NBME's service, programs, or activities or was otherwise discriminated against by Defendant NBME on the basis of disability in the following ways.

269.    Defendant NBME reviews and processes all requests for accommodations for the Step exams.

270.    Defendant NBME is a co-sponsor of the USMLE.

271.    Defendant NBME denied Plaintiff's request for 100% additional test time, additional breaks (10 minutes per each exam hour), use of a physical writing instrument and notepaper, despite extensive medical documentation supporting these requests.

272.    Defendant NBME unlawfully disadvantaged Plaintiff by splitting the exam from seven 40-question blocks to fourteen 20-question blocks.  This segmentation reduced the amount of proportional time Plaintiff could utilize for each 40-question block than similarly situated students without disability accommodations.  Plaintiff never requested such division or unequal treatment as an accommodation.

273.    Defendant NBME denied or otherwise failed to provide a reduced distraction environment as requested.  Plaintiff was placed in a separate testing room with a window

adjacent to the busy check-in and proctors' station offering no individual workstation privacy carrel similar to students in the general testing area. Rather than a reduced distraction environment as requested, this testing arrangement was an increased distraction environment.

274. Defendant NBME states on its USMLE website that any person requesting a separate testing room will typically be "placed next to the check-in or proctors' station, which can be busy." USMLE, *supra*.

275. Defendant NBME states on its USMLE website that separate testing rooms will have a "window between the separate room and the check-in or proctors' station" whereas the general testing area provides "individual workstation carrels…to shield test-takers from visual distractions." *Id.*

276. Defendant NBME is publishing statements that it will not provide reasonable accommodations and will disadvantage Plaintiff in need of reduced distraction environments compared to the general testing area.

277. Defendant NBME requires Plaintiff to submit a new accommodations request for every Step exam in the series (Step 1, Step 2, and Step 3) and for every exam attempt. It does not matter if the individual is not seeking to modify previously approved accommodations and does not matter how permanent the disability is. Plaintiff's disability is permanent and has existed since childhood. Considering the time it takes the NBME to review each accommodation request in the context of medical education and the fast pace environment of clinical rotation time schedules, the requirement that Plaintiff request accommodations for each and every exam and attempt is unreasonable. Moreover, this arrangement places Plaintiff at a scheduling disadvantage compared to other test takers.

- 53 -

278.    Defendant NBME's accommodations request process and accommodations request form are discriminatory.

279.    All the accommodations that Plaintiff requested were reasonable. None of the requests would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

280.    Defendant NBME could have reasonably provided all aids, benefits, services, programs, and activities in an accessible manner and on an equal basis to Plaintiff, to allow him a full, meaningful, and equal opportunity to participate.

281.    Defendant NBME did not make a good faith effort to accommodate Plaintiff's disability.

282.    Defendant NBME failed to engage in an interactive process.

283.    Defendant NBME failed to communicate with Plaintiff meaningfully and in good faith concerning his disability and requested accommodations.

284.    Through the acts and omissions of Defendant NBME, its employees, and its agents described herein, Defendant NBME, with intent, deliberate indifference, and reckless disregard, violated the RA and its implementing regulations.

285.    Defendant NBME is liable for the acts and omissions of its employees and agents.

286.    As a direct and proximate result of the aforementioned acts, Plaintiff has been excluded from participation in, denied the benefits of, and subjected to discrimination by Defendant NBME in violation of the RA and its implementing regulations.

287.    As a direct and proximate result of the aforementioned acts, Defendant NBME has denied Plaintiff, and continues to deny Plaintiff, the ability to sit for the Step exams in an

ut

s

accessible manner, in violation of the RA and its implementing regulations, because of Plaintiff's disability.

288.    As a direct and proximate result of the aforementioned acts and omissions by Defendant NBME, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used for his medical education.

289.    Plaintiff is entitled to declaratory and injunctive relief, compensatory damages, and reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

**FOURTH CAUSE OF ACTION**
**Retaliation under the**
**Americans with Disabilities Act and the Rehabilitation Act of 1973**
**By Plaintiff Against UR, CHERYL M. KODJO, FLAVIA NOBAY, ROBERT J. SWANTZ, ROBERT S. FREEMAN, DEBRA M. OGIE, ADRIENNE MORGAN, DAVID R. LAMBERT**

290.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as it fully set forth herein.

291.    As illustrated by one legal scholar:

> Retaliation is a deliberate action used to send a clear message that complaining is unwelcome and risky. It is employed to instill fear in others who might consider making a complaint in the future. Those with cause for complaining are frequently among the most vulnerable in an institution. Once they complain, they are labeled 'trouble-makers.' Retaliation, and the fear of retaliation, becomes a

potent weapon used to maintain the power structure within the institution.[6]

292.    Under Title III implementing regulations, "[n]o private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part." 28 C.F.R. § 36.206(a).

293.    Under Section 504 implementing regulations: "Intimidatory or retaliatory acts prohibited.  No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Section 504])." 34 C.F.R. § 100.7(e) (Section 504 incorporates the retaliation language of the regulations under Title VI of the Civil Rights Act of 1964).

294.    Defendant UR, their employees and agents, Cheryl M. Kodjo, Flavia Nobay, Robert J. Swantz, Robert S. Freeman, Debra M. Ogie, Adrienne Morgan, and David R. Lambert are all subject to, and violated, the respective anti-retaliation provisions of the ADA and RA, and engaged in prohibited retaliation through actions and omissions, including, but not limited to, those set forth as follows.

295.    Plaintiff engaged in protected activity when he opposed sitting for a program required examination without URSMD approved accommodations.

296.    Plaintiff engaged in protected activity when he requested a pause as a reasonable accommodation to gain equal access to the Step 1 exam.

---

[6] Ivan E. Bodensteiner, *The Risk of Complaining—Retaliation*, 38 J.C. & U.L. 1, 1 (2011).

297.    Defendant UR was aware of Plaintiffs protected activity because they were made directly to his AD (Dr. Kodjo), the Disability Access Coordinator (Dr. Nobay), and the UR Director of Disability Services (Jen Prosceo).

298.    Defendants UR, Dr. Kodjo, and Dr. Nobay took adverse action against Plaintiff when they: (1) summarily denied these requests; (2) told Plaintiff he could not make such a request; and (3) failed to engage in an interactive process or individualized assessment of Plaintiff's requests regarding his disability.  Such adverse actions were casually related to Mr. Polito's protected activity because they were immediate.

299.    Defendants UR, Dr. Kodjo, and Dr. Nobay took adverse action against Plaintiff by refusing to provide Plaintiff with a letter of support as other medical schools have done to support their students, knowing this would only add additional harm to Plaintiff's medical studies and future career.

300.    Plaintiff engaged in protected activity in September 2022 when he emailed Dr. Nobay reiterating concerns of discrimination and harassment and attempted to schedule a meeting.

301.    Defendants UR and Dr. Nobay took adverse action against Plaintiff by ignoring his email correspondence for nearly four weeks.

302.    All Defendants named herein took adverse action against Plaintiff at or around March 10, 2023 when they summoned his attendance to an April 4, 2023 MSPRB closed-door meeting under the guise of professional and academic concerns and threatened a mandatory leave of absence and  dismissal for failure to comply with their timeline even in the absence of its approved accommodations.

303.     Plaintiff engaged in protected activity when he reported discriminatory concerns regarding Dr. Ogie's April 4, 2023 disparaging comments regarding his disability to Dr. Kodjo.

304.     On April 19, 2023, Defendants UR, Dr. Kodjo, and Dr. Nobay, took adverse action against Plaintiff when they arranged a closed-door meeting with Plaintiff where Plaintiff was told again that his requests would not be considered and again proceeded to threaten him with dismissal if he would not comply with their demands.

305.     Plaintiff engaged in protected activity when he reported to Dr. Nobay on May 5, 2023 that an arbitrary May 15, 2023 scheduling deadline was impossible to meet as it was impossible to schedule the Step 1 exam until the after the NBME completed its review of Mr. Polito's coerced request for medically inadequate Step 1 exam accommodations.

306.     All Defendants named herein took adverse action when they ignored Plaintiffs request for accommodation.

307.     Plaintiff engaged in protected activity when he refused and opposed Dr. Kodjo's July 12, 2023 request that he forgo accommodations altogether.

308.     All Defendants named herein took adverse action against Plaintiff, the very next day on July 13, 2023, by sending him another letter threating him with an involuntary leave of absence and dismissal for failure to sit for the Step 1 exam by the end of July 2023, regardless of whether the NBME had completed its review of Plaintiff's accommodations request, and regardless of whether the requested accommodations were approved or not.

309.     On July 14, 2023, Plaintiff engaged in protected activity when he requested a medical leave of absence resulting from the conduct of all Defendants named herein reported Dr. Ogie's comments to the MSPRB following the failure of Dr. Kodjo and Dr. Lambert to report these concerns.

310.    All Defendants named herein took adverse action against Plaintiff when they published and recorded a statement Plaintiff never made, including on a July 18, 2023 MSPRB letter.

311.    On July 18, 2023, Plaintiff engaged in protected activity when he requested assistance from the Medical Students ADA Ombudsperson as outlined in the Student Handbook.

312.    On July 27, 2023, Plaintiff engaged in protected activity when he submitted a complaint to the OEI.

313.    Defendants UR, Dr. Nobay, and Dr. Lambert took adverse action against Plaintiff, when at or around July 28, 2023, they deleted the entire section covering the Medical Students ADA Ombudsperson from the Student Handbook in a July 28, 2023 update.

314.    All Defendants named herein took adverse action against Plaintiff when, at or around August 8, 2023, they placed Plaintiff on a mandatory leave of absence, terminated his disability insurance coverage, confiscated his student ID, removed him from class email lists after he refused to sit for a program required exam without accommodations that URSMD already approved.

315.    Plaintiff engaged in protected activity when he submitted a written complaint through counsel to the UR Office of Counsel around November 4, 2023.

316.    Between November 2023 and January 2024, Defendants UR and Dr. Nobay took adverse action against Plaintiff when Defendant UR failed to report back to Plaintiff's counsel as promised and withdrew Plaintiff from his medical program and where Defendants UR and Dr. Nobay subsequently refused to respond to any of Plaintiff's questions or concerns that Defendants UR and Dr. Nobay together elicited.

- 59 -

317.    Between January 2024 and July 2024, Defendants UR and Dr. Kodjo took adverse action against Plaintiff when they refused to allow Plaintiff to schedule an appointment with his primary care physician at UHS and caused the provider to breach contractual duties of care (namely, a duty not to abandon or neglect the patient) by "tying" the provider's hands after the physician requested to see Plaintiff.  This resulted in a major lapse in medical care for Plaintiff.

318.    All Defendants named herein treated Mr. Polito less favorably than his similarly situated counterparts who did not engage in protected activity.

319.    Taken together, the conduct of all Defendants named herein was severe, pervasive, offensive, and materially adverse and has undermined and detracted from Plaintiff's study of medicine, effectively denying him equal access to participation in and enjoy the benefits of UR's medical program and the UHS health center.

320.    Through their acts and omissions, all Defendants named herein, their employees, and their agents, with intent, deliberate indifference, and reckless disregard retaliated against Plaintiff for exercising his lawfully protected civil rights together in violation the respective anti-retaliation provisions of the ADA and RA.

321.    Defendant UR is liable for the acts and omissions of its employees and agents.

322.    As a direct and proximate result of the aforementioned acts and omissions by all Defendants named herein, Defendant UR's employees, and all their agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must

repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

323.    Plaintiff is entitled to injunctive relief, monetary damages, reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

### FIFTH CAUSE OF ACTION
**Interference under the**
**Americans with Disabilities Act and the Rehabilitation Act of 1973**
**By Plaintiff Against UR, CHERYL M. KODJO, FLAVIA NOBAY, ROBERT J. SWANTZ,**
**ROBERT S. FREEMAN, DEBRA M. OGIE, ADRIENNE MORGAN, DAVID R.**
**LAMBERT**

324.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as it fully set forth herein.

325.    According to the Equal Employment Opportunity Commission ("EEOC"), interference "is broader than retaliation" because a "threat does not have to be carried out in order to violate the interference provision, and an individual does not actually have to be deterred from exercising or enjoying ADA rights in order for the interference to be actionable."[7]

326.    Under Title III implementing regulations, "[n]o private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part." 28 C.F.R. § 36.206(b).

327.    Conduct prohibited includes, but is not limited to: "(1) Coercing an individual to deny or limit the benefits, services, or advantages to which he or she is entitled under the Act or

---

[7] U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOC-NVTA-2016-5, QUESTIONS AND ANSWERS: ENFORCEMENT GUIDANCE ON RETALIATION AND RELATED ISSUES (2016).

this part; (2) Threatening, intimidating, or interfering with an individual with a disability who is seeking to obtain or use the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation;" and "(3) Intimidating or threatening any person because that person is assisting or encouraging an individual or group entitled to claim the rights granted or protected by the Act or this part to exercise those rights." 28 C.F.R. § 36.206(c).

328.    Under Section 504 implementing regulations: "Intimidatory or retaliatory acts prohibited.  No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Section 504])." 34 C.F.R. § 100.7(e) (Section 504 incorporates the interference language of the regulations under Title VI of the Civil Rights Act of 1964).

329.    Defendant UR, their employees and agents, Cheryl M. Kodjo, Flavia Nobay, Robert J. Swantz, Robert S. Freeman, Debra M. Ogie, Adrienne Morgan, and David R. Lambert are all subject to, and violated, the respective anti-interference provisions of the ADA and RA, and engaged in prohibited interference through actions and omissions, including, but not limited to, those set forth as follows.

330.    For all the reasons set forth throughout this Complaint, all Defendants named herein intimidated, threatened, and interfered with Plaintiff's seeking to enjoy URSMD approved accommodations for the URSMD program required Step 1 exam.

331.    All Defendants named herein interfered with Plaintiff's seeking to enjoy URSMD approved accommodations for the URSMD program required Step 1 exam and Plaintiff's seeking to pursue his medical studies in a discrimination free environment when they repeatedly failed to report and investigate Plaintiffs concerns of discrimination and harassment in accordance with UR policy, in some cases for over one year.

- 62 -

332.    Defendants UR and Dr. Nobay interfered with Plaintiff's enjoyment of URSMD approved accommodations when Dr. Nobay ignored his September 29, 2022, request to meet for nearly four weeks.

333.    Using threats of involuntary leave and dismissal, all Defendants named herein coerced Plaintiff into requesting accommodations for the Step 1 exam inferior to those already approved by Defendant UR.

334.    Using threats of involuntary leave and dismissal, Defendants UR and Dr. Kodjo pressured Plaintiff to forgo URSMD approved accommodations altogether.

335.    Using threats of involuntary leave and dismissal, Defendants UR, Dr. Nobay, and Dr. Lambert interfered with Plaintiff's seeking assistance from the Medical Students ADA Ombudsperson by deleting it from the Student Handbook.

336.    All Defendants named herein attempted to coerce Plaintiff into taking a general leave of absence of fixed duration by documenting a request that was never made.

337.    Defendants UR and Dr. Kodjo interfered with the physician-patient relationship between Plaintiff and his physician by refusing to allow Plaintiff to schedule an appointment with his primary care physician at UHS and caused the provider to breach physician-patient contractual duties of care by "tying" the provider's hands after the physician requested to see Plaintiff.  This resulted in a major lapse in medical care for Plaintiff.

338.    All Defendants named herein treated Plaintiff less favorably than his similarly situated counterparts.

339.    Taken together, the conduct of all Defendants named herein was severe, pervasive, offensive, and materially adverse and has undermined and detracted from Plaintiff's

study of medicine, effectively denying him equal access to participation in and enjoy the benefits of its medical program and UHS health center.

340.    Through the acts and omissions of Defendant UR and its employees and agents described herein, Defendant UR, with intent, deliberate indifference, and reckless disregard, coerced, threatened, and intimidated Mr. Polito and interfered with his exercising of protected civil rights together in violation of the respective anti-interference provisions of the ADA and RA.

341.    Defendant UR is liable for the acts and omissions of its employees and agents.

342.    As a direct and proximate result of the aforementioned acts and omissions by all Defendants named herein, Defendant UR's employees, and all their agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

343.    Plaintiff is entitled to injunctive relief, monetary damages, reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

### SIXTH CAUSE OF ACTION
**Interference under the**
**Americans with Disabilities Act and the Rehabilitation Act of 1973**
**By Plaintiff Against NBME**

344.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as it fully set forth herein.

345.    Under Title III implementing regulations, "[n]o private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part." 28 C.F.R. § 36.206(b).

346.    Conduct prohibited includes, but is not limited to, "…interfering with an individual with a disability who is seeking to obtain or use the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation." 28 C.F.R. § 36.206(c).

347.    Under Section 504 implementing regulations: "Intimidatory or retaliatory acts prohibited.  No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Section 504])." 34 C.F.R. § 100.7(e) (Section 504 incorporates the interference language of the regulations under Title VI of the Civil Rights Act of 1964).

348.    Defendant NBME is subject to the anti-interference provisions of the ADA and RA, and engaged in prohibited interference through actions and omissions, including, but not limited to, those set forth as follows.

349.    Defendant NBME denied Plaintiff's request for accommodations in effort to deter Plaintiff from requesting the full accommodations by routinely denying or otherwise unreasonably scrutinizing person's with ADHD who request 100% additional time and did so in Plaintiff's case.

350.    At least one scientific study found that the NBME denied accommodations for 52% of the applications seeking disability related accommodations for the Step 1 exam.  Kristina H. Peterson, *supra*.

- 65 -

351.   Defendant NBME's publications stating it will place Plaintiff in a high distraction environment, higher than the general test taking area, serves no other purpose but to deter Plaintiff from requesting the separate, distraction free environment that he needs.

352.   Defendant NBME's requirement that Plaintiff submit a new accommodations request for every Step exam and attempt, regardless of the permanency of his disability and regardless of whether Plaintiff is seeking a modification to those accommodations, serves no other purpose than to deter Plaintiff from requesting reasonable (and medically necessary) accommodations through its unlawfully burdensome process.

353.   Defendant NBME's accommodations request process and accommodations request form constitutes interference.

354.   Taken together, Defendant NBME's conduct was (and is) severe, pervasive, offensive, and materially adverse and has undermined and detracted from Plaintiff's ability gain access to reasonable (and medically necessary) accommodations, effectively denying him equal access to participation in and enjoy the benefits of its Step exams.

355.   Defendant NBME is liable for the acts and omissions of its employees and agents.

356.   Through the acts and omissions of Defendant NBME and its employees and agents described herein, Defendant NBME, with intent, deliberate indifference, and reckless disregard, interfered with Plaintiff's exercising of lawfully protected civil rights together in violation of the ADA and RA.

357.   Defendant NBME is liable for the acts and omissions of its employees and agents.

358.   As a direct and proximate result of the aforementioned acts and omissions by Defendant NBME, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened

psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

359.    Plaintiff is entitled to injunctive relief, monetary damages, reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

## SEVENTH CAUSE OF ACTION
### Discrimination under the New York State Human Rights Law
### By Plaintiff Against UR

360.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

361.    The New York State Legislature enacted the NYSHRL finding that discrimination, prejudice, and intolerance, among others, threaten "the rights and proper privileges of its inhabitants", "menaces the institutions and foundation of a free democratic state" and "threatens the peace, order, health, safety, and general welfare of the state and its inhabitants."  N.Y. Exec. Law § 290.3.

362.    Under New York State law, the opportunity to obtain an education with equal access and without discrimination because of disability is a civil right.  N.Y. Exec. Law § 291.2.

363.    NYSHRL prohibits discrimination, harassment, coercion, and retaliation of people with disabilities.

364.    "It shall be an unlawful discriminatory practice...[f]or any employer...to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(1)(e).

- 67 -

365.    "Harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges" because of their disability.  N.Y. Exec. Law § 296(1)(h).

366.    "It shall be an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his [or her] …disability." N.Y. Exec. Law § 296(4).

367.    "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

368.    Provisions of the NYSHRL "shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparatively to the provisions of this article, have been so construed" and that "[e]xceptions to and exemptions from the provisions of this article shall be construed narrowly in order to maximize deterrence of discriminatory conduct" N.Y. Exec. Law § 300.

369.    NYSHRL permits any "person claiming to be aggrieved by an unlawful discriminatory practice" to file a cause of action "in any court of appropriate jurisdiction for damages."  N.Y. Exec. Law § 297.9.

370.    Plaintiff and Defendant UR meet the definition of a "person" under the NYSHRL.

371.    Defendant UR meets the definition of "employer" within the meaning the NYSHRL.

- 68 -

372.    Defendant UR meets the definition of "educational institution" within the meaning of the NYSHRL.

373.    Plaintiff's condition of ADHD meets the definition of "disability" under the NYSHRL as he has been diagnosed with the condition by medical professionals and is regarded as having a disability by Defendant UR.

374.    Defendant UR's violations of the ADA and RA constitute violations under the NYSHRL.

375.    For all the reasons previously set forth throughout this Complaint, Defendant UR engaged in unlawful discriminatory practices and violated the NYSHRL, including:

  a. Defendant UR denied Plaintiff its own approved accommodations for a required program exam;

  b. Defendant UR summarily denied Plaintiff's repeated requests for reasonable accommodations with no deliberation or rationale;

  c. Defendant UR limited the types of accommodations requests Plaintiff could make;

  d. Defendant UR denied Plaintiff access to reasonable accommodations by repeatedly summarily denying is requests and telling him he could not make such requests and limiting the types of requests he could make;

  e. Defendant UR created a discriminatory hostile environment for Plaintiff because of his disability;

  f. Defendant UR failed to investigate Plaintiffs repeated concerns of discrimination and harassment for over one year;

g.  Defendant UR failed to take remedial measures against its employees and agents when they failed to promptly report all concerns within 48 hours under UR policy;

h.  Defendant UR ignored Plaintiff's requests to meet regarding accommodations and concerns of discrimination and harassment;

i.  Defendant UR repeatedly denied Plaintiff's request for academic materials to be made available to him in printed mediums (versus electronic mediums) as a reasonable accommodation and/or auxiliary aid;

j.  Defendant UR subjected Plaintiff to disparaging remarks about his disability;

k.  Defendant UR coerced Plaintiff into requesting inferior accommodations through the NBME;

l.  Defendant UR pressured Plaintiff to forgo approved accommodations;

m.  Defendant UR surreptitiously deleted the entire section covering the Medical Students ADA Ombudsperson from the Student Handbook after Plaintiff requested their assistance;

n.  Defendant UR threatened, harassed, retaliated and terminated Plaintiff's medical education after he opposed sitting for an exam without approved accommodations;

o.  Defendant UR failed to take protective measures in accordance with UR after they were requested by Plaintiff;

p.  Defendant UR solicited Plaintiff's questions, clarifications, or any needs at all in January 2024 and then refused to respond when presented with Plaintiffs questions and concerns; and

q.  Defendant UR refused to allow Plaintiff to schedule an appointment with his primary care physician at UHS and caused the provider to breach physician-patient contractual duties of care by "tying" the hands of Plaintiff's physician, because Plaintiff opposed its discriminatory conduct.

376.    Taken together, Defendant UR's violations of the NYSHRL are severe, pervasive, and offensive, have subjected Plaintiff to inferior terms, conditions, and privileges, and have undermined and detracted from Plaintiff's study of medicine, obstructed his access to medical care, effectively denying him equal access to participation in and enjoy the benefits of its medical program and the UHS health center.

377.    All the accommodations that Plaintiff requested were reasonable.

378.    None of the requests would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

379.    Defendant UR could have reasonably provided all aids, benefits, services, programs, and activities in an accessible manner and on an equal basis to Plaintiff, to allow him a full, meaningful, and equal opportunity to participate.

380.    Through the acts and omissions of Defendant UR, its employees, and its agents described herein, Defendant UR acted with intent, malice, wanton disregard, and reckless disregard in violation of the NYSHRL causing injury to Plaintiff and through conduct directed at the general public.

381.    Defendant UR is liable for the acts and omissions of its employees and agents.

382.    As a direct and proximate result of the aforementioned acts and omissions, Defendant UR violated Plaintiff's civil rights under the NYSHRL.

383.    As a direct and proximate result of the aforementioned acts and omissions of Defendant UR, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, hypertension, worsened psoriasis, depression, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

384.    Plaintiff is entitled to injunctive relief; monetary damages including economic, compensatory, and punitive damages; and reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

**EIGHTH CAUSE OF ACTION**
**Discrimination under the New York State Human Rights Law**
**By Plaintiff Against NBME**

385.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

386.    NYSHRL prohibits discrimination, harassment, and retaliation of people with disabilities.

387.    Under the NYSHRL: "It shall be an unlawful discriminatory practice for an educational institution to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of his [or her] …disability." N.Y. Exec. Law § 296(4).

388.    "Harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges" because of their disability.  N.Y. Exec. Law § 296(1)(h).

- 72 -

389.    NYSHRL permits any "person claiming to be aggrieved by an unlawful discriminatory practice" to file a cause of action "in any court of appropriate jurisdiction for damages." N.Y. Exec. Law § 297.9.

390.    Plaintiff and Defendant NBME, named in this Complaint, meet the definition of a "person" under the NYSHRL.

391.    Defendant NBME meets the definition of "employer" within the meaning of the NYSHRL.

392.    Defendant NBME meets the definition of "educational institution" under the NYSHRL or is otherwise subject to the NYSHRL.

393.    Plaintiff's condition of ADHD meets the definition of "disability" under the NYSHRL as he has been diagnosed with the condition by medical professionals and is regarded as having a disability by Defendant NBME.

394.    Defendant NBME's violations of the ADA and RA constitute violations under the NYSHRL.

395.    For all the reasons previously set forth throughout this Complaint, Defendant NBME violated the NYSHRL, including:

396.    Defendant NBME reviews and processes all requests for accommodations for the Step exams.

397.    Defendant NBME is a co-sponsor of the USMLE.

398.    Defendant NBME denied Plaintiff's request for 100% additional test time, additional breaks (10 minutes per each exam hour), use of a physical writing instrument and notepaper, despite extensive medical documentation supporting these requests.

399.     Defendant NBME unlawfully disadvantaged Plaintiff by splitting the exam from seven 40-question blocks to fourteen 20-question blocks.  This segmentation reduced the amount of proportional time Plaintiff could utilize for each 40-question block than similarly situated students without disability accommodations.  Plaintiff never requested such division or unequal treatment as an accommodation.

400.     Defendant NBME denied or otherwise failed to provide a reduced distraction environment as requested, despite sufficient medical documentation.  Plaintiff was placed in a separate testing room with a window adjacent to the busy check-in and proctors' station offering no individual workstation privacy carrel similar to students in the general testing area.  Rather than a reduced distraction environment as requested, this testing arrangement was an increased distraction environment.

401.     Defendant NBME states on its USMLE website that any person requesting a separate testing room will typically be "placed next to the check-in or proctors' station, which can be busy."  USMLE, *supra.*

402.     Defendant NBME states on its USMLE website that separate testing rooms will have a "window between the separate room and the check-in or proctors' station" whereas the general testing area provides "individual workstation carrels…to shield test-takers from visual distractions." *Id.*

403.     Defendant NBME is publishing statements that it will not provide reasonable accommodations and will disadvantage individuals with disabilities in need of reduced distraction environments compared to the general testing area.

404.     Defendant NBME requires Plaintiff to submit a new accommodations request for every Step exam in the series (Step 1, Step 2, and Step 3) and for every exam attempt.  It does

not matter if the individual is not seeking to modify previously approved accommodations and does not matter how permanent the disability is. Plaintiff's disability is permanent and has existed since childhood. Considering the time it takes the NBME to review each accommodation request in the context of medical education and the fast pace environment of clinical rotation time schedules, the requirement that Plaintiff request accommodations for each and every exam and attempt is unreasonable. Moreover, this arrangement places Plaintiff at a scheduling disadvantage compared to other test takers.

405. Defendant NBME's accommodations request process and accommodations request form are discriminatory.

406. Taken together, Defendant NBME's violations of the NYSHRL are severe, pervasive, and offensive, have subjected Plaintiff to inferior terms, conditions, and privileges, and have undermined and detracted from Plaintiff's study of medicine, effectively denying him equal access to participation in and enjoy the benefits of its Step exams.

407. All the accommodations that Plaintiff requested were reasonable.

408. None of the requests would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

409. Defendant NBME could have reasonably provided all aids, benefits, services, programs, and activities in an accessible manner and on an equal basis to Plaintiff, to allow him a full, meaningful, and equal opportunity to participate.

410. Through the acts and omissions of Defendant NBME, its employees and agents described herein, Defendant NBME acted with intent, malice, wanton disregard, and reckless

disregard in violation of the NYSHRL causing injury to Plaintiff and through conduct directed at the general public.

411.    Defendant NBME is liable for the acts and omissions of its employees and agents.

412.    As a direct and proximate result of the aforementioned acts and omissions, Defendant NBME violated Plaintiff's civil rights under the NYSHRL.

413.    As a direct and proximate result of the aforementioned acts and omissions by NBME, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, hypertension, worsened psoriasis, depression, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used for his medical education.

414.    Plaintiff is entitled to injunctive relief; monetary damages including economic, compensatory, and punitive damages; and reasonable attorneys' fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

**NINETH CAUSE OF ACTION**
**Aiding and Abetting in Violation of the New York State Human Rights Law**
**By Plaintiff Against UR, CHERYL M. KODJO, FLAVIA NOBAY, ROBERT J. SWANTZ, ROBERT S. FREEMAN, DEBRA M. OGIE, ADRIENNE MORGAN, DAVID R. LAMBERT**

415.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

416.    Under the NYSHRL: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6).

417.    "It shall be an unlawful discriminatory practice for any person engaged in any

activity to which this section applies to retaliate or discriminate against any person because he or

she has opposed any practices forbidden under this article or because he or she has filed a

complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

418.    NYSHRL permits any "person claiming to be aggrieved by an unlawful

discriminatory practice" to file a cause of action "in any court of appropriate jurisdiction for

damages." N.Y. Exec. Law § 297.9.

419.    Plaintiff and Defendants UR, Flavia Nobay, and Cheryl M. Kodjo, Robert J.

Swantz, Robert S. Freeman, Debra M. Ogie, Adrienne Morgan, and David R. Lambert named in

this Complaint, meet the definition of a "person" under the NYSHRL.

420.    All Defendants herein were given and exercised significant supervisory powers

either as the operators (Defendant UR) or senior administrators (all other Defendants).

421.    As alleged throughout this Complaint, Defendant UR participated in unlawful

discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful discriminatory

acts, and therefore aided and abetted in violation of the NYSHRL. Examples of such conduct

include:

    a.  Failing to take prompt, remedial measures, despite notice; and

    b.  Subjecting Plaintiff to unlawful discrimination and a hostile environment

        through its contractual, licensing, or other arrangements with the NBME.

422.    Defendant UR is aware that the NBME unlawfully discriminates against exam

applicants with disabilities.

423.    Numerous lawsuits and federal investigations have resulted in adverse actions against the NBME over the years for its discriminatory conduct against applicants with disabilities.

424.    Dr. Lambert has commented to Plaintiff that he has never seen the NBME grant the accommodations that UR has determined to be reasonable under the law and approved for Plaintiff, namely, 100% extra time for exams.  Though the underlying conclusion of this statement is not technically accurate as courts have previously ordered the NBME provide similar accommodations, it does evidence the awareness of the significant barrier Plaintiff was facing because of his disability and the reasonableness of his request for assistance from URSMD and the time necessary to address the issue with the NBME himself.

425.    Nevertheless, Defendant UR continues to cooperate with, and financially support, the NBME through its purchase of test materials, appointment of a Medical School Liaison to the NBME, and other collaboration on testing and curriculum.

426.    Defendant UR is fully aware that the NBME has published on its USMLE website that it unlawfully discriminates because students requesting accommodations in the form of "separate testing rooms" will be subjected to inferior testing environments when compared to the "standard" testing area.  USMLE, *supra.*

427.    As alleged throughout this Complaint, Defendant Cheryl M. Kodjo participated in unlawful discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful discriminatory acts, and therefore aided and abetted in violation of the NYSHRL.   Such conduct includes:

      a.   Summarily denying Plaintiff's requests for accommodations;

      b.   Limiting the types of accommodations requests Plaintiff could make;

    c.  Interfering with Plaintiff's ability to have his requests properly reviewed by UR through actions including telling Plaintiff he could not make certain requests;

    d.  Coercing Plaintiff to request inferior accommodations;

    e.  Failing to promptly report (within 48 hours) Plaintiff's concerns of discrimination and harassment in accordance with UR policy;

    f.  Actively participating in conduct facilitating the environment surrounding, and including, the April 4, 2023 MSPRB meeting where disparaging statements about Plaintiff and his disability were permitted in a locked room occupied by URSMD's most senior administrators, after having confiscated Plaintiff's cell phone to ensure the unlawful acts could not be recorded;

    g.  Pressuring Plaintiff to forgo accommodations for the Step 1 exam;

    h.  Actively participating in retaliating or otherwise discriminating against Plaintiff for engaging in protected activity by, among other actions, placing Plaintiff on an involuntary leave of absence and subsequently withdrawing Plaintiff from URSMD; and

    i.  Actively participating in retaliating, interfering, or otherwise discriminating against Plaintiff for engaging in protected activity by refusing to allow Plaintiff to schedule an appointment with his primary care physician at UHS and causing the physician to breach physician-patient contractual duties of care by "tying" the hands of Plaintiff's physician.

428.    As alleged throughout this Complaint, Defendant Flavia Nobay participated in unlawful discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful

discriminatory acts, and therefore aided and abetted in violation of the NYSHRL. Such conduct includes:

    a.  Summarily denying Plaintiff's requests for accommodations;

    b.  Limiting the types of accommodations requests Plaintiff could make;

    c.  Interfering with Plaintiff's ability to have his requests properly reviewed by UR through actions including telling Plaintiff he could not make certain requests;

    d.  Coercing Plaintiff to request inferior accommodations;

    e.  Failing to promptly report (within 48 hours) Plaintiff's concerns in accordance with UR policy;

    f.  Ignoring Plaintiff's email's regarding his discrimination and harassment concerns;

    g.  Actively participating in conduct facilitating the environment surrounding, and including, the April 4, 2023 MSPRB meeting where disparaging statements about Plaintiff and his disability were permitted in a locked room occupied by URSMD's most senior administrators, after having confiscated Plaintiff's cell phone to ensure the unlawful acts could not be recorded;

    h.  Actively coordinating with Defendant Dr. Kodjo in pressuring Plaintiff to forgo accommodations on the Step 1 exam and retaliating with a letter threatening an involuntary leave of absence and dismissal the following day;

    i.  Lying about or otherwise making misleading statements regarding the Medical Students ADA Ombudsperson;

j.  Actively participating in actions deleting the entire section regarding the Medical Students ADA Ombudsperson from the Student Handbook after Plaintiff requested their assistance;

k.  Making false and misleading statements to Plaintiff and in drafting letters on behalf of the MSPRB and UR;

l.  Actively participating in actions to falsify Plaintiff's student record.

m.  Agreeing to provide Plaintiff with copies of Student Handbooks but never providing them;

n.  Actively participating in retaliating or otherwise discriminating against Plaintiff for engaging in protected activity by, among other actions, placing Plaintiff on an involuntary leave of absence and subsequently withdrawing Plaintiff from URSMD; and

o.  Refusing to respond when presented with Plaintiff's questions or concerns that she directly solicited in a January 2024 letter, and instead exhibiting retaliatory animus by remarking about Plaintiff being assisted by legal counsel regarding discrimination and harassment concerns.

429.  As alleged throughout this Complaint, Defendant Robert J. Swantz participated in unlawful discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful discriminatory acts, and therefore aided and abetted in violation of the NYSHRL.  Such conduct includes:

a.  Denying Plaintiff's requests for accommodations;

b.  Limiting the types of accommodations requests Plaintiff could make;

    c.   Failing to promptly report (within 48 hours) Plaintiff's concerns of discrimination and harassment in accordance with UR policy;

    d.   Actively participating in conduct facilitating the environment surrounding, and including, the April 4, 2023 MSPRB meeting where disparaging statements about Plaintiff and his disability were permitted in a locked room occupied by URSMD's most senior administrators, after having confiscated Plaintiff's cell phone to ensure the unlawful acts could not be recorded; and

    e.   Actively participating in retaliating or otherwise discriminating against Plaintiff for engaging in protected activity by, among other actions, placing Plaintiff on an involuntary leave of absence and subsequently withdrawing Plaintiff from URSMD.

430.    As alleged throughout this Complaint, Defendant Robert S. Freeman participated in unlawful discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful discriminatory acts, and therefore aided and abetted in violation of the NYSHRL. Such conduct includes:

    a.   Denying Plaintiff's requests for accommodations;

    b.   Limiting the types of accommodations requests Plaintiff could make;

    c.   Failing to promptly report (within 48 hours) Plaintiff's concerns of discrimination and harassment in accordance with UR policy;

    d.   Actively participating in conduct facilitating the environment surrounding, and including, the April 4, 2023 MSPRB meeting where disparaging statements about Plaintiff and his disability were permitted in a locked room

occupied by URSMD's most senior administrators, after having confiscated

Plaintiff's cell phone to ensure the unlawful acts could not be recorded; and

e.  Actively participating in retaliating or otherwise discriminating against

Plaintiff for engaging in protected activity by, among other actions, placing

Plaintiff on an involuntary leave of absence and subsequently withdrawing

Plaintiff from URSMD.

431.    As alleged throughout this Complaint, Defendant Debra M. Ogie participated in

unlawful discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful

discriminatory acts, and therefore aided and abetted in violation of the NYSHRL.  Such conduct

includes:

f.  Denying Plaintiff's requests for accommodations;

g.  Limiting the types of accommodations requests Plaintiff could make;

h.  Failing to promptly report (within 48 hours) Plaintiff's concerns of discrimination

and harassment in accordance with UR policy;

i.  Actively participating in conduct facilitating the environment surrounding, and

including, the April 4, 2023 MSPRB meeting where she made disparaging

statements about Plaintiff and his disability in a locked room occupied by

URSMD's most senior administrators, after having confiscated Plaintiff's cell

phone to ensure the unlawful acts could not be recorded; and

j.  Actively participating in retaliating or otherwise discriminating against Plaintiff

for engaging in protected activity by, among other actions, placing Plaintiff on an

involuntary leave of absence and subsequently withdrawing Plaintiff from

URSMD.

432.    As alleged throughout this Complaint, Defendant Adrienne Morgan participated in unlawful discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful discriminatory acts, and therefore aided and abetted in violation of the NYSHRL. Such conduct includes:

  a. Denying Plaintiff's requests for accommodations;

  b. Limiting the types of accommodations requests Plaintiff could make;

  c. Failing to promptly report (within 48 hours) and investigate Plaintiff's concerns of discrimination and harassment in accordance with UR policy;

  d. Actively participating in conduct facilitating the environment surrounding, and including, the April 4, 2023 MSPRB meeting where disparaging statements about Plaintiff and his disability were permitted in a locked room occupied by URSMD's most senior administrators, after having confiscated Plaintiff's cell phone to ensure the unlawful acts could not be recorded;

  e. Actively participating in denying Plaintiff's requests for protective measures in accordance with UR policy; and

  f. Actively participating in retaliating or otherwise discriminating against Plaintiff for engaging in protected activity by, among other actions, placing Plaintiff on an involuntary leave of absence and subsequently withdrawing Plaintiff from URSMD.

433.    As alleged throughout this Complaint, Defendant David R. Lambert participated in unlawful discriminatory acts, attempted to, or otherwise condoned and endorsed unlawful discriminatory acts, and therefore aided and abetted in violation of the NYSHRL.  Such conduct includes:

g.  Denying Plaintiff's requests for accommodations;

h.  Limiting the types of requests Plaintiff could make;

i.  Failing to promptly report (within 48 hours) and investigate Plaintiff's concerns of discrimination and harassment in accordance with UR policy;

j.  Actively participating in conduct facilitating the environment surrounding, and including, the April 4, 2023 MSPRB meeting where disparaging statements about Plaintiff and his disability were permitted in a locked room occupied by URSMD's most senior administrators, after having confiscated Plaintiff's cell phone to ensure the unlawful acts could not be recorded;

k.  Actively participating in actions deleting the entire section regarding the Medical Students ADA Ombudsperson from the Student Handbook after Plaintiff requested their assistance.  Defendant Dr. Lambert exercises final authority on the Student Handbook which is published from his office through his administrative assistant.  Defendant Dr. Lambert has also held the same administrative position during the events of 2015-2016 when parts of the Student Handbook were abrogated in violation of the rights of another medical student with a disability; and

l.  Actively participating in retaliating or otherwise discriminating against Plaintiff for engaging in protected activity by, among other actions, placing Plaintiff on an involuntary leave of absence and subsequently withdrawing Plaintiff from URSMD.

434.    Taken together, the violations of the NYSHRL by all Defendants named herein are severe, pervasive, and offensive, have subjected Plaintiff to inferior terms, conditions, and

privileges, and have undermined and detracted from Plaintiff's study of medicine, effectively denying him equal access to participation in and enjoy the benefits of its medical program and UHS health center.

435.    Through the acts and omissions of all Defendants named herein, Defendants acted with intent, malice, wanton disregard, and reckless disregard in violation of the NYSHRL causing injury to Plaintiff and through conduct directed at the general public.

436.    Defendant UR is liable for the acts and omissions of its employees and agents.

437.    As a direct and proximate result of the aforementioned acts and omissions, all Defendants named herein violated Plaintiff's civil rights under the NYSHRL.

438.    As a direct and proximate result of the aforementioned acts and omissions by all Defendants named herein, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, hypertension, worsened psoriasis, depression, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

439.    Plaintiff is entitled to injunctive relief; monetary damages including economic, compensatory, and punitive damages; and reasonable attorney's fees and costs incurred in bringing this action as set forth in the Prayer for Relief section below.

### TENTH CAUSE OF ACTION
### Breach of Contract
### By Plaintiff Against UR

440.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

- 86 -

441.   Express Contract 1—Plaintiff and UR entered a valid written contract: the URSMD
       Student Handbook.

442.   Plaintiff performed on this contract.

443.   Defendant UR breached this contract through actions including, among others:

   a. Repeatedly engaging in mistreatment, harassment, discrimination, and
      retaliating against Plaintiff;

   b. Failing to, and refusing to provide its own approved accommodations;

   c. Summarily denying repeated requests for reasonable accommodations with no
      deliberation or rationale;

   d. Eliminating the Medical Students ADA Ombudsperson from the Student
      Handbook after becoming aware Plaintiff was seeking assistance from the
      Medical Students ADA Ombudsperson;

   e. Denying Plaintiff access to this promised independent expert in both disability
      accommodations and medical education as it relates to URSMD;

   f. Violating clear and unambiguous promises that it complied with all federal
      and state laws;

   g. Violating clear and unambiguous promises that URSMD was fully accredited
      by the LCME and therefore met all LCME accreditation standards; and

   h. Violating a clear and unambiguous promise to pause any further adverse
      action (such as withdrawal) against Plaintiff until a mutual agreement could be
      worked out.

444.   For all of the reasons set forth throughout the Complaint, Plaintiff incurred
damages attributable to the breach.

445.    Implied Contract 1—Alternatively, and implied contract between Plaintiff was formed when UR accepted Plaintiff for enrollment.

446.    Plaintiff was required to agree to the Student Handbook and Plaintiff paid tuition and fees.  The Student Handbook was therefore material to the relationship.

447.    Defendant UR has made and breached the following specific promises, duties, and obligations set forth in the Student Handbook and, among others, that were material to the relationship:

   a.    That URSMD would not engage in mistreatment, discrimination, harassment, or retaliation;

   b.    That specific accommodations were approved for Plaintiff and would be provided for all examinations and quizzes;

   c.    That the ADA Access Coordinator would meet with Plaintiff every semester;

   d.    That Plaintiff had access to the Medical Students ADA Ombudsperson, Dr. Susan Hetherington, PhD, who, among other services outlined in **Exhibit 1**, was available to meet with Plaintiff and advocate on his behalf;

   e.    That UR had effective treatment of medical students and anti-discrimination policies as required by LCME accreditation standards;

   f.    That UR complied with all federal and state laws;

   g.    That URSMD was fully accredited by the LCME and therefore met all accreditation standards;

   h.    That it would provide Plaintiff with copies of all versions of the Student Handbook; and

- 88 -

     i.   That UR would pause any further adverse action (such as withdrawal) against Plaintiff until a mutual agreement could be worked out.

448.    Contract 2—Distinct from Defendant UR's contract with Plaintiff as a student, Defendant UR also had a contractual relationship with the Plaintiff through its employee at UHS: the physician patient contractual relationship between Plaintiff and Dr. Behrman that was established around August 2020.

449.    Defendant UR refused to allow Plaintiff to schedule an appointment with his primary care physician at UHS after the physician requested to see the patient thereby resulting in a breach of physician-patient contractual duties of care (namely, a contractual duty not to abandon or neglect the patient).  Defendant UR "tied" the hands of Plaintiff's physician resulting in a major lapse in medical care and subsequent injury to Plaintiff.

450.    Tortious Interference with Contract 2—Alternative to Contract 2, to the extent that the physician-patient contractual relationship between Plaintiff and Dr. Behrman constitutes a third-party relationship, Plaintiff pleads tortious interference with contract by Defendant UR as follows:

     a.   Plaintiff and Dr. Behrman established a physician-patient contractual relationship around August 2020;

     b.   Through its operation of UHS, Defendant UR had knowledge of this contract;

     c.   Defendant UR intentionally, improperly, and unjustifiably caused Dr. Behrman's breach of this contractual relationship through, among other actions, "tying" his hands, and not allowing Plaintiff to schedule an appointment to be seen as requested by Dr. Behrman; and

     d.   The resulting lapse in medical care caused significant injury to Plaintiff.

451.    Under New York State law, all contracts (express and implied) imply a covenant of good faith and fair dealing in the course of performance.

452.    URSMD breached its covenant of good faith and fair dealing with Plaintiff on multiple occasions, for reasons including those set forth as follows:

  a. Summarily denying repeated requests for reasonable accommodations with no deliberation or rationale;

  b. Limiting the types of accommodations requests Plaintiff could make;

  c. Ignoring Plaintiff's requests to meet with the ADA Access coordinator for nearly four weeks;

  d. Coercing Plaintiff to forgo accommodations;

  e. Failing to report and investigate concerns of discrimination and harassment in accordance with UR policy;

  f. Deleting an entire section covering the Medical Students ADA Ombudsperson from the Student Handbook and the ADA Access Coordinator's responsibility to meet with the student every semester;

  g. Failing to implement Plaintiff's requests for temporary protective measures in accordance with UR policy;

  h. Failing to provide Plaintiff with copies of all Student Handbooks as promised;

  i. Soliciting Plaintiff's questions, clarifications, or any needs at all in January 2024 and then refusing to respond when presented with Plaintiff's questions and concerns; and

  j. Improperly terminating Plaintiff's care at UHS.

453.    Through the acts and omissions of Defendant UR and its employees and agents described throughout this Complaint, Defendant UR acted in bad faith, breached express contractual obligations, and breached implied contractual obligations causing Plaintiff significant harm.

454.    Based on the reasons set forth throughout this Complaint, Plaintiff at all times acted in good faith and fulfilled his contractual obligations.  Plaintiff followed all lawful requirements of UR while only opposing requirements that were in violation of federal laws, state laws, or accreditation standards.

455.    Defendant UR is liable for the acts and omissions of its employees and agents.

456.    As a direct and proximate result of the aforementioned acts and omissions by Defendant UR, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

457.    Pursuant to New York State law, Plaintiff is entitled to damages and equitable remedies for breach of contract as set forth in the Prayer for Relief section below.

## ELEVENTH CAUSE OF ACTION
### Promissory Estoppel
### By Plaintiff Against UR

458.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

459.    Alternative to breach of contract, Plaintiff asserts claims arising under promissory estoppel.

460.    Defendant UR has made the following clear and unambiguous promises, that were material to the relationship, among others:

      a.   That URSMD would not engage in mistreatment, discrimination, harassment, or retaliation;

      b.   That specific accommodations were approved for Plaintiff and would be provided for all examinations and quizzes, including the Step 1 exam;

      c.   That the ADA Access Coordinator would meet with Plaintiff every semester to review accommodations;

      d.   That Plaintiff had access to the Medical Students ADA Ombudsperson, Dr. Susan Hetherington, PhD, who, among other services outlined in Exhibit A, was available to meet with Plaintiff and advocate on his behalf;

      e.   That UR complied all federal and state laws;

      f.   That URSMD was fully accredited by the LCME and therefore met all accreditation standards;

      g.   That UR would pause any further adverse action (such as withdrawal) against Plaintiff until a mutual agreement could be worked out;

      h.   That UR would provide Plaintiff with copies of all Student Handbooks; and

      i.   That UR would respond to Plaintiff's questions, clarifications, or any needs at all in January 2024 and then refusing to respond when presented with Plaintiff's questions and concerns.

461.    Based on the reasons set forth throughout this Complaint, Plaintiff reasonably relied upon these promises.  In preparing for a career as a physician with disability, Plaintiff applied to and matriculated into URSMD because it was an LCME accredited medical school with a supportive, inclusive environment for persons with disabilities.  Plaintiff believed that he would be granted accommodations across all aspects of the medical school program, in accordance with federal and state laws, and would not be subjected to discrimination, harassment, and retaliation.  Plaintiff proceeded through his medical school training believing in UR's promises of an inclusive environment and that he could always reach out to the named Medical Students ADA Ombudsperson when needed.

462.    Around the time Plaintiff's causes of action arose, Plaintiff had already completed more than two years of medical school, paid tuition and related expenses, and was under contract with the NHSC.

463.    Based on the reasons set forth throughout this Complaint, Plaintiff relied upon these promises to his own detriment.

464.    Based on the reasons set forth throughout this Complaint, Plaintiff's reliance on these specific promises was expected and foreseeable by Defendant UR.

465.    Defendant UR is liable for the acts and omissions of its employees and agents.

466.    As a direct and proximate result of the aforementioned acts and omissions by Defendant UR, its employees, and its agents, Plaintiff has suffered injuries, including but not limited to, humiliation, hardship, indignity, fatigue, depression, hypertension, worsened psoriasis, anxiety and other significant mental and emotional anguish, involuntary withdrawal from his medical program, loss of his remaining scholarship for medical school, lost opportunity

to become a physician, breach of contract with HHS, and now must repay the scholarship funds and federal financial assistance loans used at Defendant UR's institution.

467.    Plaintiff is entitled to damages for injuries resulting from the reliance as set forth in the Prayer for Relief section below.

## TWELFTH CAUSE OF ACTION
### Unjust Enrichment
### By Plaintiff Against UR and NBME

468.    Plaintiff alleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

469.    Alternative to and distinct from breach of contract, Plaintiff asserts claims arising under unjust enrichment.

470.    Defendants UR and NBME were unjustly enriched at the expense of Plaintiff.

471.    Plaintiff paid tuition and fees to Defendant UR and exam application fees to Defendant NBME.

472.    Shortly following matriculation, Defendant UR granted plaintiff specific accommodations for "all examinations and quizzes". This included the Step 1 exam.

473.    Nevertheless, Defendant UR continued to charge and receive Plaintiff's tuition monies, including federal monies precipitating from Plaintiff's student loan disbursements and contract with HHS, without providing its approved accommodations across all required examinations.

474.    Taken together, equity and good conscience demand that Defendant UR should not be permitted to retain these monies.

475.    Defendant NBME charged and received a large application fee from Plaintiff to register and sit for the Step 1 exam.

476.    Defendant NBME denied Plaintiff's requests for accommodations in bad faith, failed to provide the accommodations that it had approved, and refused to provide a refund.

477.    Taken together, equity and good conscience demand that Defendant NBME should not be permitted to retain these monies.

478.    Plaintiff is entitled to restitution for the monies retained as set forth in the Prayer for Relief section below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Curt A. Polito respectfully requests that this Court enter judgement against all Defendants and provide the following relief:

1.    Issue an order finding and declaring all Defendants' acts, omissions, policies, and practices as challenged herein unlawful;

2.    Award Plaintiff with compensatory and punitive damages in an amount to be determined at trial;

3.    Provide Plaintiff with equitable relief through means including injunction and specific performance by Defendant UR that will enable Plaintiff to complete his MD program free from discrimination and harassment;

4.    Provide Plaintiff with equitable relief through means including injunction that:

    a.    Will provide Plaintiff with the accommodations requested for all NBME/USMLE examinations;

    b.    Require Defendants UR and NBME to strike, or otherwise discount, the June 2022 Step 1 exam as an attempt toward their individual limits;

    c.    Requires Defendant NBME to (1) waive its requirement that Plaintiff pay a

nonrefundable application fee and choose an exam date, often not yet

available, before even making a request for accommodations and (2) waive its

requirement that Plaintiff be "actively enrolled" under a policy left purely to

the determination of the medical school;

5.    Award Plaintiff pre- and post-judgement interest, costs, and attorneys' fees in an

amount to be determined at trial; and

6.    Provide and award Plaintiff such other relief as this Court may deem just and

proper.

## JURY TRIAL DEMANDED

Plaintiff Curt A. Polito respectfully demands a trial by jury on all issues so triable.

Dated: November 12, 2024.

Curt A. Polito
1340 Mount Hope Ave, Unit C
Rochester, NY 14620
(585) 540-0128
curtpolito@outlook.com

*Pro se Plaintiff*